# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 6, 2006 Session

## STATE OF TENNESSEE v. PAUL DENNIS REID, JR.

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 97-C-1836     Cheryl Blackburn, Judge**

---

**No. M2003-00539-SC-DDT-DD - December 27, 2006**

---

The defendant, Paul Dennis Reid, Jr., was convicted of three counts of premeditated murder, three counts of felony murder, one count of attempted murder, and one count of especially aggravated robbery. The trial court merged each of the felony murder convictions with the corresponding premeditated murder convictions. The jury sentenced the defendant to death based upon four aggravating circumstances, see Tenn. Code Ann. § 39-13-204(i)(2), (6), (7), (12) (Supp. 1996), and further found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, see Tenn. Code Ann. § 39-13-204(g)(1) (Supp. 1996). We hold that (1) the trial court did not err by finding the defendant competent to stand trial; (2) the trial court did not err by admitting the testimony of the defendant's former employer; (3) the trial court did not err by denying the motion to limit proof regarding the defendant's financial condition; (4) the trial court did not err by refusing to recuse itself from the case; (5) the trial court did not err by allowing the State to introduce evidence of the murders at the Captain D's restaurant to establish the "mass murder" aggravating circumstance; and (6) the defendant's sentences of death are not invalid under the mandatory review criteria of Tennessee Code Annotated section 39-13-206(c)(1). As to the remaining issues, we agree with the conclusions reached by the Court of Criminal Appeals. The relevant portions of its opinion are appended. The judgment of the Court of Criminal Appeals is, therefore, affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined. ADOLPHO A. BIRCH, JR., SP.J., concurred in part and dissented in part.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michelle Chapman McIntire, Assistant Attorney General; Victor S. Johnson, III, District Attorney General;

and Kathy Morante, Tom Thurman, Roger Moore, Grady Moore, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

The defendant, Paul Dennis Reid, Jr., was indicted for three counts of premeditated murder, three counts of felony murder during the perpetration of a robbery, one count of attempted first degree murder, and one count of especially aggravated robbery.

### Guilt Phase of Trial

On March 23, 1997, Ronald Santiago, Andrea Brown, Robert Sewell, and Jose Ramirez Gonzales, employees of a McDonald's restaurant on Donelson Pike in Davidson County, Tennessee, had just completed their night shift when the defendant forced his way into the restaurant, ordered them into the office, and demanded money. After Santiago, the manager, handed over the contents of the restaurant safe, the defendant directed the employees into a storage area and ordered them to lie on the floor. He then fired two shots each into the heads of Brown, Santiago, and Sewell. When the defendant attempted to shoot Gonzales, however, the gun malfunctioned. Gonzales struggled and the defendant drew a knife and stabbed him repeatedly. Gonzales stopped fighting, feigned death, and when the defendant left, was able to telephone for help. Santiago and Sewell died at the scene. Brown died later at the hospital.

At trial, Gonzales testified that on the night of the shooting he and Robert Sewell were leaving the restaurant when they were confronted by a man armed with a small, silver handgun and carrying a bag under his arm. Gonzales recalled that the man, whom he later identified as the defendant, said something in English. Santiago, who was in the doorway of the restaurant and overheard the comment, translated into Spanish, informing Gonzales that the defendant had ordered them back into the restaurant. When the three men returned to the restaurant, the defendant demanded the money from the safe and placed the contents into his bag. Gonzales recalled that the defendant then directed the employees into a storage area where he shot Sewell, Santiago, and Brown execution-style. The defendant then attempted to shoot Gonzales, but the gun malfunctioned. Gonzales fought the defendant but was overpowered and stabbed in the stomach. As Gonzales fell to the floor, the defendant stabbed and kicked him repeatedly. The defendant discontinued the attack only when Gonzales pretended to be dead. Although badly injured, Gonzales was able to telephone 911 after the defendant left. The police arrived minutes later and Gonzales was taken to the hospital by ambulance.

Dorothy Carter, the dispatcher who answered the 911 call, testified that she could hear only groans and mumbling. Although she was unable to communicate with the caller, she nevertheless dispatched both the police and an ambulance to the restaurant.

Detective Mike Rolland, who investigated, found no fingerprints, shoe prints, or other physical evidence linking the defendant to the crime scene. He and other officers found six

Remington .25 caliber automatic cartridge casings inside the restaurant. Testing established that the casings matched the .25 caliber bullets recovered from the three murder victims.

Detective Pat Postiglione testified that Gonzales worked with a police sketch artist in an effort to develop a composite drawing of the suspect. Gonzales had described the mustached perpetrator as twenty-nine to thirty years old, tall, thin, and possibly of Hispanic descent, with long hair only partially covered by his baseball cap. Detective Postiglione confirmed that during the investigation, Gonzales viewed more than three hundred photographs of potential suspects, eventually identifying the defendant some four months after the shootings.

Other testimony established that prior to the crimes the defendant had moved from Texas to Nashville to pursue a career in country music. He obtained employment at a Shoney's restaurant, where Mitchell Roberts served as manager. Roberts testified that the defendant worked at the Shoney's until February of 1997, only weeks before the shootings. He stated that he next saw the defendant in June of 1997 when the defendant unexpectedly arrived at his residence. Roberts recalled that the defendant had in his possession a small caliber automatic handgun and a knife that was approximately eight to nine inches long.

Danny Tackett, a former co-worker of the defendant, testified that in January 1997, he overheard the defendant, who was experiencing financial difficulties, speak of robbing a fast food restaurant at night, when there would be no witnesses. Tackett recalled that the defendant asked him for help in procuring a gun. The defendant made similar comments to another former co-worker, Jeffrey Potter, and explained that robbery was an easy way to make money. Potter testified that the defendant had also solicited his assistance in an effort to acquire a gun.

The proof established that approximately eight to ten weeks before the crimes, Robert Bolin sold the defendant two .25 caliber automatic handguns. One was nickel-plated with black handle grips and the other was nickel-plated with pink handles. Bolin testified that he gave the defendant a box of ammunition in a green and yellow box as a part of the transaction.

Agent Tommy Heflin of the Tennessee Bureau of Investigation, who was familiar with ammunition for handguns, testified that the bullets recovered from the bodies of the victims were Remington brand. Agent Heflin confirmed that Remington ammunition was packaged in a green and yellow box.

**Sentencing Phase**

After the jury returned guilty verdicts and during the penalty phase of the trial, Assistant District Attorney Brian Johnson of Harris County, Texas, testified that the defendant had been convicted of aggravated robbery in his state in 1984. Walt Draper of the Davidson County Criminal Court Clerk's Office testified that the defendant had been convicted of two counts of first degree murder and one count of aggravated robbery on April 14, 1999. John Carney, Jr., District Attorney General for the Nineteenth Judicial District, testified that on September 22, 1999, the defendant had been convicted of two counts of first degree murder, two counts of especially aggravated kidnapping,

and one count of aggravated robbery. The parties stipulated that each of these crimes involved the use of violence to the person.

Detective Postiglione pointed out the similarities between the crimes in this case and those that the defendant had committed earlier at a nearby Captain D's restaurant. According to the officer, the two separate criminal episodes took place at fast food restaurants. Both occurred on a Sunday while the restaurants were closed. In each instance, the restaurants had been locked following the crimes. In addition, there was no sign of forced entry at either restaurant. The defendant had used a small caliber weapon and in each incident, the victims were forced to lie face down in an isolated area of the restaurant before they were murdered. Each of the murder victims suffered two gunshot wounds to the head. Detective Postiglione testified that the modus operandi in each case was unlike any other that had been used in Davidson County in at least fifteen years.

Robert Sewell's sister, Connie Chesmore, testified that the death of her twenty-three-year-old brother had affected their family "in every way." She stated that her father was too angry to attend the trial and that her grief-stricken mother was simply unable to testify. Another sister, Brenda Sewell, confirmed her mother's distressed emotional state, explaining, for example, that she could no longer prepare the family meals.

Ivette Rivera, the widow of Ronald Santiago, testified that both she and her daughter suffered extensively after her husband's death. Santiago's brother, Jamie Palmir, testified that his family had been devastated by the experience. He explained that their mother was unable to attend the trial because of poor health.

Doyle Brown testified that his seventeen-year-old daughter, Andrea Brown, attended Hume-Fogg High School, where she was an excellent student with many friends. His daughter had performed volunteer work at a homeless mission and aspired to be a chef. Brown, who believed he could not recover emotionally from his daughter's death, stated that he had kept both her room and her car, which was purchased on the day before her murder, exactly as they had been at the time of the shooting.

Dr. Xavier Amador, a witness for the defense, diagnosed the defendant as suffering from chronic paranoid schizophrenia. It was his opinion that the defendant experienced delusions that he was under constant government surveillance. Dr. Amador learned from the family members of the defendant that the defendant had suffered from delusions nearly all of his adult life and believed that he had been selected for a secret governmental mission which required constant surveillance. Dr. Amador testified that the defendant, who had declared his intention to become a lawyer when "this is all over," believed that the government surveillance team would take care of his legal problems. The defendant was also diagnosed with anosognosia, a symptom of psychosis in which a person with a brain injury compulsively attempts to prove that he is free of a mental illness. Dr. Amador found that the defendant's brain had been "broken" by a series of head injuries as a child.

Dr. Pamela Auble, a neuropsychologist, examined the defendant, concluding that he experienced difficulty with language skills, lacked reasoning in complicated situations, and had lost motor skills as a result of brain injury. It was her opinion that the defendant did, in fact, suffer from delusions that he was under government surveillance. She explained that it was the defendant's belief that the inmate in the adjacent cell was a government agent assigned to either kill him or drive him crazy. Dr. Auble determined that the defendant was suffering from a psychotic disorder caused by his general medical condition, that he had a cognitive disorder which was caused by his previous head injuries, and that he was not malingering. It was her opinion that the psychotic and cognitive disorders had a "significant impact" on the defendant's criminal acts. On cross-examination, however, Dr. Auble acknowledged her awareness that the defendant had malingered in the past and that he had lied to others about statements she had made to him. She conceded that his crimes required planning and were not the result of impulse.

Patricia Allen, a language pathologist at Vanderbilt Medical Center, evaluated the defendant at the request of Dr. Auble. Upon reviewing the defendant's medical and school records, she learned that he had a chaotic childhood, living alternately with his mother, grandmother, and father. She stated that the defendant's home environment hampered the development of normal speech and language skills. Allen confirmed that the defendant had suffered multiple head injuries as a child, testifying that in separate incidents, he had been hit in the back of the head with a brick, had fallen off of a bicycle, and had been hit by a car. She learned that the defendant had also been involved in a car accident as an adult resulting in a loss of consciousness. It was her conclusion that the defendant's behavior was consistent with his history of brain injury. Ms. Allen acknowledged that she did not test the defendant for malingering. She conceded that in many of the tests she administered, the defendant scored average and above average.

Dr. Robert Kessler, a neuroradiologist, conducted magnetic resonance imaging (MRI) and positron emission tomography (PET) scans on the defendant. He testified that the scans indicated shrinkage or atrophy of the left temporal lobe of the defendant's brain. It was his opinion that the defendant suffered from decreased glucose metabolism, which was the result of the dysfunction of the left temporal lobe. Dr. Kessler explained that the brain damage had likely been caused by a head injury when the defendant was seven or eight years old. He described the damage to the left temporal lobe as associated with psychotic disorders producing delusional states. Dr. Kessler acknowledged, however, that the injury would not have prevented the defendant from planning and executing the robbery and murders.

Dr. Helen Mayberg, a neurologist, also examined the defendant and testified in rebuttal for the State. While she agreed that the defendant suffered an abnormality of the left temporal lobe of his brain, it was her opinion that the damage was congenital rather than the result of any trauma. Dr. Mayberg testified that no single area of the brain could be associated with schizophrenia or psychosis. It was her conclusion that the damage to the defendant's left temporal lobe did not cause him to commit the crimes at issue.

At the conclusion of the penalty phase of the trial, the jury imposed sentences of death for each of the three counts of first degree murder. The jury found that four aggravating circumstances had been proven beyond a reasonable doubt, see Tenn. Code Ann. § 39-13-204(i)(2), (6), (7), (12) (Supp. 1996), and that the evidence of aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt, see Tenn. Code Ann. § 39-13-204(g) (Supp. 1996). Because the Court of Criminal Appeals affirmed the convictions and sentences, the appeal was automatically docketed in this Court. See Tenn. Code Ann. § 39-13-206(a)(1) (Supp. 1996).

**Analysis**

*I. Competence*

The defendant first asserts that the trial court erred by finding that he was competent to stand trial. The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a mentally incompetent person from being put to trial. Pate v. Robinson, 383 U.S. 375, 378 (1966); State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000). To be competent to stand trial, a criminal defendant must have "'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)). The defendant bears the burden of establishing his incompetence by a preponderance of the evidence. State v. Reid, 164 S.W.3d 286, 306-08 (Tenn. 2005). The trial court's findings "are conclusive on appeal unless the evidence preponderates otherwise." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

Prior to trial, the trial court held extensive hearings on the issue of competence, took judicial notice of the expert testimony that had been presented during the penalty phase of the Captain D's trial, see State v. Reid, 91 S.W.3d 247, 267-71 (Tenn. 2002) (for a summary of mental health evidence presented), and reviewed the proof presented at the defendant's competency hearing in the Baskin-Robbins case, see Reid, 164 S.W.3d at 303-06 (same). Mary Ann Hea, Reverend Joe Ingle, James Kyne, and Dr. Auble testified for the defense, and Dr. Daniel Martell testified on behalf of the State. Dr. Keith Caruso, Dr. Samuel Craddock, Dr. Rokaya Farooque, and Rebecca Smith served as independent experts appointed by the trial court.

Dr. Auble, who first examined the defendant during the trial of the Captain D's murders, testified at a hearing in the Baskin-Robbins case that the defendant was incompetent to stand trial. It was her testimony in this case that the defendant suffered from delusions and anosognosia, had difficulty conceptualizing, and had an increasing distrust of his attorneys. She opined that these disabilities prevented the defendant from consulting with his attorneys with any reasonable degree of factual understanding. Dr. Auble believed that the defendant labored under the delusion that his trial was a part of a larger conspiracy by the government to frame him for the murders so he would receive the death penalty. While she admitted that the defendant had a previous history of malingering, that he had rationally discussed many facets of his case with his attorneys, and that he understood the roles of the prosecutor, the judge, and the defense attorneys, Dr. Auble believed that the defendant's delusions had worsened over time.

Ms. Hea, a social worker employed by the Davidson County Public Defender's Office, testified that the defendant lacked trust in his attorneys and refused to talk with her about his case. She recalled that the defendant did discuss his childhood, television shows, his ambitions to become a lawyer when he was released from prison, and the possibility of marriage at some point in the future. Ms. Hea stated that the defendant had claimed that a portion of his brain had been removed and that he had the brain of a man half his age. She also recalled that the defendant had asked for documents from his previous trials so that he could work on his appeals.

Reverend Ingle, who had become the defendant's pastor through his work in prison ministries, spent more than seventy-five hours talking with the defendant. He found that the defendant did not focus on his trial strategy and instead tended to concentrate on irrelevant details. Reverend Ingle observed that the defendant expended a great deal of energy trying to appear normal, often watching and mimicking the behavior of others. It was his opinion that the defendant behaved much like a twelve-year-old boy.

James Kyne, who met the defendant through Reverend Ingle's prison ministry, testified that the defendant believed that the trial had a predetermined outcome. It was his opinion that the defendant had an irrational view of the judicial system. Kyne confirmed that the defendant claimed that he was under government surveillance.

Dr. Martell, a psychologist specializing in forensic psychology and neuropsychology, testified as a witness for the State at the competency hearing. He had evaluated the defendant prior to the Captain D's trial and had conducted a two-hour interview with the defendant on the day before he testified in this case. It was his opinion that during the most recent interview, the defendant was not suffering from hallucinations or delusions. He recalled that the defendant explained that his attorneys had decided to pursue a mental illness defense because of his convictions in the Baskin-Robbins case. According to Dr. Martell, the defendant understood from his attorneys that he might be spared the death penalty if they could establish that he was suffering from a mental illness. The defendant also informed Dr. Martell that Dr. Auble had previously indicated her desire to do all that she could to prevent him from being executed.

Dr. Martell testified that the defendant believed that the prosecutor was attempting to manufacture evidence by making the Captain D's and McDonald's murders appear similar. He stated that the defendant pointed out numerous discrepancies in the proof presented at the Captain D's trial as proof of his theory. The defendant also contended that he did not trust his attorneys because they were "killing him" through their incompetence. It was Dr. Martell's opinion that the defendant understood the legal process and was competent to stand trial. He stated that the defendant possessed an "acute understanding" of the trial procedures, including the roles of the judge, jury, defense attorneys, and prosecutors, and recognized the possibility of a death sentence. The defendant also understood that he had been charged with capital offenses. Dr. Martell testified that although he had previously diagnosed the defendant with a delusional disorder with grandiose and persecutory features, that condition appeared to be in remission.

Dr. Keith Caruso, an independent expert appointed by the trial court, met with the defendant on three occasions, reviewed the reports of other experts, and read the transcript of the competency hearing in the Baskin-Robbins case. It was Dr. Caruso's opinion that the defendant was incompetent to stand trial:

> [H]e appears to have a schizo-affective disorder, bipolar type, most recent episode mixed, which includes both manic and depressive features. There are several symptoms that he has of that condition I feel that interferes with his competency at this time. I believe that he has persecutory paranoid grandiose delusions that involve the government and date back a number of years, but more recently have begun to incorporate [defense counsel], among others into his delusional system in that he has, that has impaired him because of his paranoia about [defense counsel] and [defense counsel's] motives. That has impaired him in his capacity to work with [defense counsel].
>
> I believe also associated with the delusional system, he also has a thought disorder that is manifested by tangential speech, loosening of associations, preservative thought, concrete thought processes as well. I feel that it makes it difficult for him to reason and to think clearly at all times. I think there are times where he has windows where he appears to think clearly, but what I felt on that issue was that it was essentially that it was not predictable when those would occur, in that he does not have predictable competency. I feel he is incompetent in those areas as well.
>
> I did feel that he had irrational as well as factual appreciation of the possible consequences of the charges against him.

It was also his opinion that the defendant was not malingering and, in fact, was attempting to appear normal.

Dr. Caruso, the only expert to diagnose the defendant with schizo-affective disorder, acknowledged that the defendant had been able to discuss trial strategies. He also conceded that the defendant provided a reasonable explanation as to why he did not want to offer mitigation evidence and that he understood court procedure, the roles of the parties, the purpose of the competency proceedings, the charges against him, and the nature of the legal proceedings. Dr. Caruso explained that the discrepancies between his findings and those of Dr. Martell were the result of the defendant's mood swings.

After hearing testimony from Drs. Auble, Martell, and Caruso, the trial court ordered that the defendant be evaluated by the Forensic Services Division of the Tennessee Department of Mental Health. Dr. Samuel Craddock, a forensic psychologist on the evaluation team, met with the defendant on five separate occasions and concluded that he was rational, competent, and prepared "to proceed with his trial." It was Dr. Craddock's opinion that the defendant understood the

seriousness of the charges against him, had a factual understanding of the evidence, and was willing to cooperate with his attorneys to achieve the best possible outcome. Dr. Craddock acknowledged that certain aspects of the defendant's personality did interfere with his ability to work with his attorneys.

Dr. Craddock testified that the evaluation team diagnosed the defendant with mixed receptive and expressive language disorder, anti-social personality disorder, hearing loss in the left ear, and a congenital malformation of the left temporal lobe of the brain. It was his opinion that while the defendant had previously suffered from mental illness, he did not display any signs or symptoms of a delusional personality disorder. Dr. Craddock disagreed with the diagnoses of Drs. Auble and Caruso and did not believe that the defendant was delusional at the time of the competency hearing. Dr. Rokaya Farooque, a psychiatrist, and Rebecca Smith, a social worker, who were also part of the evaluation team, concurred with the findings of Dr. Craddock.

Dr. Auble testified in rebuttal at the competency hearing, expressing her belief that the defendant's mental condition was worsening. It was also her opinion that the defendant's trust in his legal counsel had deteriorated and she explained that the defendant's claim that he was willing to work with his attorneys was a part of his effort to appear normal.

At the conclusion of the hearing, the trial court found the defendant competent to stand trial, placing particular emphasis on statements by the defendant during a recorded session with Dr. Caruso. During that interview, the defendant expressed an understanding of the charges against him, the possible penalties, the roles of the judge and jury, the differences in procedure in capital and non-capital cases, the role of evidence in a trial, and specific incriminating evidence against him. The trial court determined that the defendant was able to consult with his counsel and otherwise assist in the preparation of his defense.

In our view, the evidence in the record does not preponderate against the trial court's finding that the defendant was competent to stand trial. The trial court heard and specifically accredited the testimony of Drs. Martell, Craddock, and Farooque. In addition, the trial court found that the defendant himself had expressed an understanding of the proceedings. Although the defendant had been diagnosed by Drs. Auble and Caruso with anosognosia, the trial court was free to assess their credibility and reject their expert testimony. Moreover, the trial court applied the correct legal standard: whether the defendant had "'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" Black, 815 S.W.2d at 174 (quoting Mackey, 537 S.W.2d at 707).

During the oral argument of this case, the defendant asked this Court to consider as a post-judgment fact that the State had conceded in an unrelated federal court proceeding that the defendant was not competent to waive his appeals under the standard announced in Rees v. Peyton, 384 U.S. 312, 314 (1966). Under certain limited circumstances, this Court may consider facts which arise after entry of the trial court's judgment. See Tenn. R. App. P. 14; State v. Williams, 52 S.W.3d 109, 122 (Tenn. Crim. App. 2001). The authority granted by Rule 14 "generally will extend only to those

facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." Tenn. R. App. P. 14(a). Facts not appropriate for consideration under Rule 14 include those which are merely cumulative, could be controverted or contested when presented to the trial court, and which might lead to differing opinions or conclusions. Duncan v. Duncan, 672 S.W.2d 765, 767-68 (Tenn. 1984). Rule 14, therefore, "is not intended to permit a retrial in the appellate court." Tenn. R. App. P. 14, Advisory Commission Comments.

The defendant has a total of seven murder convictions with corresponding death sentences for each arising out of three separate trials. This case involves the direct appeal of the last of the three cases to be tried. Post-conviction litigation in the other two cases is pending in the State and Federal courts. The defendant's sister, Linda Martiniano, recently filed a petition for a stay of execution and a request to act as the defendant's next friend in the United States District Court for the Middle District of Tennessee, citing the defendant's incompetence as a basis for the motion and petition. The District Court ordered that the defendant be evaluated to establish his present competency. The State appeared in the District Court on August 24, 2006, and announced that it would "withdraw its objection" to Martiniano acting as next friend of the defendant "on the basis of a psychological examination that was conducted by our retained expert . . . just last week . . . which resulted in a finding by our expert a conclusion that [the defendant] is presently incompetent to make a rational decision to waive his capital appeals in accordance with the standards set forth in" Rees v. Peyton.

In a report attached to the defendant's motion, Dr. Martell states that the defendant is suffering from "very specific paranoid psychopathology (i.e., persecutory delusions) superimposed on an antisocial personality disorder, and against a backdrop that is otherwise largely within normal limits. . . . These findings are consistent . . . with an Axis I diagnosis of Delusional Disorder." It is Dr. Martell's opinion that the defendant must be treated for his mental disease in order to meet the Rees standard. He pointed out, however, that Delusional Disorder "is one of the most difficult and intractable mental disorders to treat."

In our view, the State's concession and Dr. Martell's findings have little, if any, bearing on the issues presented in this direct appeal. While the defendant has raised the issue of his competence to stand trial, a current finding of incompetence would not affect our analysis. See Black, 815 S.W.2d at 174 ("'[A] competency hearing is a very narrow inquiry aimed at determining whether one who is charged with a criminal offense is presently competent to stand trial.'" (quoting State v. Stacy, 556 S.W.2d 552, 553 (Tenn. Crim. App. 1977)); cf. Berndt v. State, 733 S.W.2d 119, 122 (Tenn. Crim. App. 1987) (holding in a case considering whether the trial court should have conducted a competency hearing sua sponte that "an appellate court may only consider those facts which were before the court when the trial commenced"). Further, Dr. Martell opined during the competency hearing just before the trial in this case that the defendant's delusions were in remission and that he was competent at that point in time. That the defendant's condition is no longer in

remission would have no impact on the trial court's finding of his competence to stand trial. The motion to consider post-judgment facts must, therefore, be denied.

Finally, the defendant has asked this Court to supplement the record with the transcript of the federal proceeding, including Dr. Martell's report. Because we have determined that neither the transcript nor the report may be considered under Tennessee Rule of Appellate Procedure 14, it is our view that the record should not be supplemented with these documents.

## II. Testimony of Mitchell Roberts

The defendant asserts that the trial court should have excluded testimony that, shortly after the crimes, he possessed a small caliber, automatic handgun and a double-bladed knife. Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). At trial, Mitchell Roberts, the defendant's former employer, testified that the defendant possessed the gun and the knife after the commission of the crimes. The Court of Criminal Appeals ruled that the trial court did not err by admitting the testimony, reasoning that the evidence was relevant and not prohibited by Tennessee Rule of Evidence 404(b) because the possession of a weapon is not necessarily a crime or wrongful act. We agree.

Other jurisdictions have ruled similarly in these circumstances. For example, in Busey v. United States, the Court of Appeals for the District of Columbia ruled that "testimony that Busey possessed a revolver that might have been the murder weapon was not admitted improperly to establish criminal propensity. That evidence was directly relevant . . . because it constituted evidence supporting the charge that Busey was the person who" committed the crimes charged. Busey v. United States, 747 A.2d 1153, 1165 (D.C. Cir. 2000). That court has also ruled that "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." Coleman v. United States, 379 A.2d 710, 712 (D.C. Cir. 1977). Similarly, in People v. Houston, the Michigan Court of Appeals determined that proof that Houston had possessed a .380 handgun three days before the victim was murdered with the same caliber weapon "was directly relevant to identifying defendant as the killer," concluding that the evidence was not inadmissible under Rule 404(b) because the "mere possession of a pistol is not a crime." People v. Houston, 683 N.W.2d 192, 195-96 (Mich. Ct. App. 2004). In Williams v. State, the Indiana Supreme Court observed that "[i]t is by no means clear that weapons possession, evidence of gun sales, and the like, are necessarily prior 'bad acts' for 404(b) purposes." Williams v. State, 690 N.E.2d 162, 174-75 (Ind. 1997). Finally, the Maryland Supreme Court has also agreed that the defendant's possession of guns or ammunition does not qualify as a bad act under the evidentiary rules. Klauenberg v. State, 735 A.2d 1061, 1073 (Md. 1999).

Under Tennessee law, it is a crime to carry a firearm or large knife with the "intent to go armed." See Tenn. Code Ann. § 39-17-1307 (2003). Nevertheless, weapons of the type described by Roberts, a double-bladed knife and a small caliber weapon, may be lawfully possessed under a variety of circumstances. See Tenn. Code Ann. § 39-17-1308 (2003). In our view, the ownership of these weapons, standing alone, does not constitute a crime. The testimony that Roberts saw the

defendant in the possession of weapons similar to those used in the crimes did not necessarily constitute evidence of a bad act. Because of the weapons' similarity to those described by the victim Gonzales, the evidence was especially probative as to the identity of the perpetrator. The trial court did not err by admitting the testimony of Mitchell Roberts.

### III. Defendant's Financial Condition

The defendant contends that the trial court erred by admitting testimony that he left his employment at a Shoney's restaurant in February of 1997, received no severance pay, and was unemployed at the time of the crimes. He asserts that evidence of his poverty was irrelevant under Tennessee Rule of Evidence 401. In the alternative, he contends that the evidence should have been excluded as more prejudicial than probative under Tennessee Rule of Evidence 403.

Several jurisdictions have concluded that the poverty of an accused is generally inadmissible as proof of a motive for theft or robbery because its probative value is outweighed by the danger of unfair prejudice. See United States v. Mitchell, 172 F.3d 1104, 1108-10 (9th Cir. 1999); see also United States v. Weller, 238 F.3d 1215, 1220-21 (10th Cir. 2001); United States v. Zipkin, 729 F.2d 384, 390 (6th Cir. 1984); United States ex rel. Mertz v. New Jersey, 423 F.2d 537, 541-42 (3d Cir. 1970); Davis v. United States, 409 F.2d 453, 457-58 (D.C. Cir. 1969); People v. Harris, 118 P.3d 545, 570 (Cal. 2005); State v. Kennard, 6 P.3d 38, 42 (Wash. Ct. App. 2000). A majority, however, have determined that evidence of a defendant's poverty is admissible when coupled with proof of an unexplained improvement in his financial status. See, e.g., United States v. Bensimon, 172 F.3d 1121, 1129 (9th Cir. 1999) ("To be admissible . . . poverty evidence must be accompanied by something more, such as an 'unexplained, abrupt change in circumstances.'" (quoting Mitchell, 172 F.3d at 1109)).

In our view, evidence that a defendant is poor, without more, has little probative value. As observed by the Ninth Circuit Court of Appeals, "A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to . . . unfair prejudice with little probative value." Mitchell, 172 F. 3d at 1108-09. The better rule, therefore, is that the State must introduce proof of "something more" than a defendant's poverty in order to meet the threshold of relevance necessary for admission.

In this instance, "something more" was proof that despite the loss of his job without severance pay, the defendant had made several cash purchases totaling in excess of $800, had sought to invest $3000, and had over $1000 in coins in his possession at the time of his arrest. That the defendant had no legitimate source of income following the termination of his employment, coupled with proof of these expenditures shortly after the robbery, was relevant, circumstantial evidence of the commission of the crimes. Accordingly, the trial court did not err in admitting testimony about his financial condition at the time of the crimes.

### IV. Recusal

The defendant also asserts that the trial judge erred by denying his motion for recusal. He contends that because the same trial judge had presided over the Captain D's trial, the judge was

unable to impartially exercise her role as thirteenth juror in this case. See generally State v. Carter, 896 S.W.2d 119, 121-22 (Tenn. 1995) (for a history and explanation of the thirteenth juror rule). He also argues that the trial judge's comments during the competency hearing demonstrated that she had an opinion on that issue prior to hearing the evidence.

The Court of Criminal Appeals ruled "that the judge's participation in [d]efendant's previous capital murder trial" did not "color[] her rulings in this case in any regard." That court also concluded that "the judge's remarks and actions at the competency hearing did not indicate partiality . . . and did not warrant recusal."

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." State v. Austin, 87 S.W.3d 447 app. at 470 (Tenn. 2002). "[T]he preservation of the public's confidence in judicial neutrality requires not only that the judge be impartial in fact, but also that the judge be perceived to be impartial." Kinard v. Kinard, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). Recusal is warranted "when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). "Hence, the test is ultimately an objective one since the appearance of bias is as injurious to the integrity of the judicial system as actual bias." Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 565 (Tenn. 2001). "Whether recusal is necessary . . . rests within the discretion of the trial court." State v. McCary, 119 S.W.3d 226, 260 (Tenn. Crim. App. 2003) (citing Caruthers v. State, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991)). This Court will not interfere with the trial court's discretion unless clear abuse appears on the face of the record. Caruthers, 814 S.W.2d at 67.

A trial judge is not disqualified because that judge has previously presided over legal proceedings involving the same defendant. See State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995) ("'A judge is in no way disqualified because he tried and made certain findings in previous litigation.'" (quoting King v. State, 391 S.W.2d 637, 642 (1965)). Moreover, "[p]rior knowledge of facts about the case is not sufficient in and of itself to require disqualification." Alley, 882 S.W.2d at 822.

In this instance, the defendant has simply been unable to establish that the trial judge's participation in the prior trial prevented her from exercising her role as thirteenth juror free from bias. The approval of the prior verdict, standing alone, is not cause for recusal. The defendant asserts, however, that there was other evidence of partiality. He points to a comment by the trial judge, who explained that because she was familiar with the proof presented during his previous two trials, she had little interest in relitigating the issues resolved during those trials. The defendant asserts that this is evidence of a predisposition on the part of the trial judge.

In our assessment, the actions of the trial court were designed to expedite the litigation. That the trial judge ruled that the evidence would be limited to proof of the defendant's existing mental state, as opposed to his mental state at the prior trials, did not establish that she had formed an opinion with regard to competence. The issue of competence is, of course, to be determined at the

time of trial. See Black, 815 S.W.2d at 174. An adverse ruling does not necessarily indicate bias or prejudice. Alley, 882 S.W.2d at 821. Moreover, comments reflecting "insensitivity and lack of sympathy on the part of the judge" are insufficient to establish impartiality unless they are pervasive and accompanied by prejudicial conduct. Id. at 822. Because the defendant has failed to establish that the trial judge acted inappropriately, recusal was not required.

## V. Mass Murder Aggravating Circumstance

The defendant contends that the trial court erred during the penalty phase of the trial by permitting the State to introduce evidence of the murders at the Captain D's restaurant as a means of establishing the "mass murder" aggravating circumstance. He argues that because the trial court excluded the evidence during the guilt phase of the trial, the jury should not have been permitted to consider the prior convictions in their deliberation on capital punishment.

At the time of the offenses, the "mass murder" aggravating circumstance was defined as follows: "The defendant committed 'mass murder,' which is defined as the murder of three (3) or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan." Tenn. Code Ann. § 39-13-204(i)(12) (Supp. 1996). In State v. Bobo, 727 S.W.2d 945 (Tenn. 1987), this Court examined this particular aggravating circumstance in detail, concluding that it "may be constitutionally applied if the triggering offenses are shown only by convictions that have been entered prior to the sentencing hearing at which they are to be utilized." Bobo, 727 S.W.2d at 955. Later, this Court recognized that "the 'mass murder' aggravating circumstance [is] appropriate for a series of separate but related homicides committed as part of a common scheme or plan." State v. Smith, 868 S.W.2d 561, 582 (Tenn. 1993).

The defendant argues that the "mass murder" circumstance was not applicable because the trial court had previously determined that the murders at the Captain D's and McDonald's were not part of a common scheme or plan. The record establishes that the State initially sought to introduce proof of the prior murder convictions during the guilt phase of the trial under Tennessee Rule of Evidence 404(b) in an effort to establish the defendant's identity as the perpetrator. While determining that the murders at the two restaurants were part of a common scheme or plan, the trial court nevertheless excluded the evidence because the probative value was outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b). "[I]t comes down to . . . a weighing process," the trial court observed, "[W]hat I would be asking the jury to do would be to hear proof about other homicides and then disregard it, and I'm not so sure that is even humanly possible to do."

The trial court excluded the evidence during the guilt phase by the application of Rule 404(b). The standard for admission of prior convictions during the guilt phase, however, is different than the standard in the penalty phase. While the Rules of Evidence govern the former, the latter standard is statutory. Tennessee Code Annotated section 39-13-204(c) provides, in pertinent part, as follows:

> In the sentencing proceeding, evidence may be presented as to any matter that the
> court deems relevant to the punishment and may include, but not be limited to, the

-14-

nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. <u>Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence</u>; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

Tenn. Code Ann. § 39-13-204(c) (2003) (emphasis added). The rules of evidence, therefore, do not limit the admissibility of evidence in a capital sentencing proceeding. <u>State v. Stout</u>, 46 S.W.3d 689, 702 (Tenn. 2001) (citing <u>Van Tran v. State</u>, 6 S.W.3d 257, 271 (Tenn. 1999)). Our statute empowers "'trial judges [with] wider discretion than would normally be allowed under the Tennessee Rules of Evidence'" in the admission of evidence during the penalty phase of a capital case. <u>Id.</u> at 703 (quoting <u>State v. Sims</u>, 45 S.W.3d 1, 14 (Tenn. 2001). "The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." <u>Sims</u>, 45 S.W.3d at 14. Because the rules of evidence "are too restrictive and unwieldy in the arena of capital sentencing," the terms of the statute apply. <u>Id.</u> The question here is not whether the Captain D's murder convictions were admissible under Tennessee Rule of Evidence 404(b), but instead whether that evidence was reliable and relevant to one of the aggravating or mitigating circumstances.

Detective Postiglione testified during the penalty phase that the murders of the McDonald's employees were similar to those the defendant had committed at the Captain D's. The State submitted that the murders qualified, under the statutory definition, as a common scheme or plan, a necessary component of the "mass murder" aggravating circumstance. <u>See</u> Tenn. Code Ann. § 39-13-204(i)(12) (Supp. 1996).

Indeed, each of the murders took place at a franchised, fast food restaurant. There were other similarities. The crimes were committed when the restaurants were closed but while the employees remained inside. There were robberies at each location. The victims in each instance were moved to an isolated area, ordered to the floor, and shot twice in the head. The offenses occurred within thirty-five days of each other. While perhaps falling short of the criteria for admission under Rule 404, these comparable elements satisfy the terms of the statute. The prior convictions were also admitted to prove that the defendant had previously committed felonies involving violence. <u>See</u> Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1996). The convictions for the prior murders were reliable and relevant to the issue of punishment in this case. Thus, the trial court did not err by allowing proof of the convictions in order to establish the "mass murder" aggravating circumstance.

In <u>State v. Branam</u>, 855 S.W.2d 563, 570 (Tenn. 1993), we held that the trial court should not have instructed the jury on the aggravating circumstance under Tennessee Code Annotated section 39-17-204(i)(6) where there was "not a shred of evidence in the record" to support the claim. Here, however, the State presented reliable evidence that the defendant had committed two murders

at the Captain D's and established that there were significant commonalities with the crimes in this case. Thus, the trial court did not err by submitting the "mass murder" aggravating circumstance to the jury.

### VI. Mandatory Review Pursuant to Tenn. Code Ann. § 39-13-206(c)(1)

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), this Court must determine whether the evidence supported the jury's finding that the aggravating circumstances were established beyond a reasonable doubt and that the aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(B)-(C) (2003). The record establishes that the jury found that four aggravating circumstances had been proven beyond a reasonable doubt:

> (2) The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;
>
> . . . .
>
> (6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;
>
> (7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit . . . robbery . . .;
>
> . . . .
>
> (12) The defendant committed "mass murder," which is defined as the murder of three (3) or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan; . . . .

Tenn. Code Ann. § 39-13-204(i)(2), (6), (7), (12) (Supp. 1996).

### A. Prior Violent Felonies

The evidence adduced during the sentencing hearing established that the defendant had been convicted of aggravated robbery in 1984 in Texas; two counts of first degree murder and one count of aggravated robbery on April 14, 1999, in Davidson County; and two counts of first degree murder, two counts of especially aggravated kidnapping, and one count of aggravated robbery on September 22, 1999, in Montgomery County. The parties stipulated that each of these crimes involved the use of violence to the person. This evidence is sufficient to establish the prior violent felony aggravating circumstance.

### B. Avoiding, Interfering With, or Preventing Lawful Arrest

Two of his former co-workers testified that the defendant had discussed robbing fast food restaurants as a means of making money. Danny Tackett and Jeffrey Potter each recalled that the

-16-

defendant, who was experiencing financial difficulties, talked about robbing a fast food restaurant in the middle of the night and leaving no witnesses. In our view, this evidence is sufficient to support the application of the aggravating circumstance for avoiding, interfering with, or preventing lawful arrest.

### C. Felony Murder

The proof at trial overwhelmingly established that the murders were perpetrated during the robbery of the McDonald's. Gonzales testified that the defendant demanded cash from the restaurant safe. He stated that Santiago gave the money to the defendant, who then stashed it in a bag he was carrying. The defendant then ordered the employees to lie on the floor before shooting Santiago, Sewell, and Brown twice in the back of the head. Under these circumstances, it is our view that the evidence is sufficient to establish the felony murder aggravating circumstance.

### D. "Mass Murder"

"[F]or this section to apply, the State must show beyond a reasonable doubt (1) that the defendant had been *convicted* of three or more murders, including the one for which he has just been tried, (2) within the State of Tennessee, (3) within a period of forty-eight (48) months, (4) perpetrated in a similar fashion, and (5) in a common scheme or plan."

Black, 815 S.W.2d at 183 (quoting Bobo, 727 S.W.2d at 956). Little has been written with regard to this factor, which is unique to Tennessee. See Bobo, 727 S.W.2d at 951; cf. Ohio Rev. Code Ann. § 2929.04(5) (2006) (providing as an aggravating circumstance that the defendant "was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.") This Court has approved of its application in a case where the defendant shot his four children in the garage of his residence, see State v. Holton, 126 S.W.3d 845, 865 (Tenn. 2004); in a case where the defendant stabbed, shot, and disemboweled his estranged wife and her two children, see Smith, 868 S.W.2d at 582; in a case where the defendant killed his girlfriend and her children, see Black, 815 S.W.2d at 184; and in a case where the defendant killed three people during the robbery of a restaurant, see State v. Van Tran, 864 S.W.2d 465, 478 (Tenn. 1993). The Court of Criminal Appeals has also approved of the application of this aggravating circumstance in a sentence of life without parole where the defendants killed three members of the same family at a rest stop. See State v. Howell, 34 S.W.3d 484, 509 (Tenn. Crim. App. 2000).

In this case, the State points to fourteen similarities between the murders committed in this case and those committed at the Captain D's. The murders in each instance were committed at a fast food restaurant on a Sunday while the restaurants were closed. The victims in each case were forced to lie on the floor in an isolated area of the restaurant. Each victim was shot at least twice with a small caliber weapon. The restaurants were locked after the crimes. The murders occurred thirty-five days apart at restaurants only three miles apart. Both cash and coins were taken from the safe. Detective Postiglione testified that the modus operandi in the two incidents was unlike any other

which had been used in Davidson County in at least fifteen years. In our view, this evidence was sufficient to establish the "mass murder" aggravating circumstance.

*E. Weighing of Mitigating Evidence*

In mitigation of his offenses, the defendant presented evidence of his unstable childhood, his prior brain injuries, and his mental illness. Dr. Amador testified that the defendant had been abandoned by his mother at a young age and had lived periodically with his father and grandmother until he was an adolescent, when he returned to his mother. Dr. Amador made reference to the defendant's various head injuries and made a diagnosis of chronic schizophrenia, paranoid type. It was the opinion of Patricia Allen that the defendant's language and thinking fit the profile of a person with acquired brain injuries. Dr. Auble diagnosed the defendant with a psychotic disorder and personality changes caused by head trauma. Dr. Mayberg, testifying for the State, could find no evidence linking the defendant's brain abnormalities with his commission of the murders in this case.

While the mitigating evidence was compelling, the proof of the aggravating circumstances was simply overwhelming. The evidence supports the jury's conclusion that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

*F. Proportionality Review*

When a defendant has been sentenced to death, this Court is required to engage in a comparative proportionality analysis. Tenn. Code Ann. § 39-13-206(c)(1)(D) (2003). "[C]omparative proportionality review 'presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.'" State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984). "[T]his Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes. . . . [A] death sentence is disproportionate if a case is 'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.'" State v. Davis, 141 S.W.3d 600, 619-20 (Tenn. 2004) (quoting Bland, 958 S.W.2d at 668). "[T]he pool of cases considered by this Court . . . includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Id. at 620.

While there is no specific formula for comparing similar cases, this Court generally considers the following factors regarding the offense:

(1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence

of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

Id. This Court must also consider the following factors about the defendant: "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Id. (citing Bland, 958 S.W.2d at 667; State v. Bane, 57 S.W.3d 411, 428-29 (Tenn. 2001)).

In this case, the defendant confronted three of the victims just outside the McDonald's. A fourth victim was inside the restaurant. The defendant demanded the contents of the safe, ordered the victims to the floor of a storage area, and murdered three of the four victims execution-style before his gun malfunctioned. When shot, the victims were in a defenseless position. The defendant then kicked and stabbed the fourth victim repeatedly and discontinued his attack only when the victim pretended to be dead.

The defendant had previously been convicted of several serious, violent felonies, including first degree murder, especially aggravated kidnapping, and aggravated robbery. Although the defendant had a tumultuous childhood and experienced mental and behavioral problems from an early age, possibly as the result of a brain injury or a congenital disorder, there was some indication of malingering. There was no evidence of remorse, cooperation with the authorities, or potential for rehabilitation.

Sentences of death have been upheld by this Court for this defendant under similar circumstances. In our proportionality review in the Captain D's case, this Court concluded that "[w]hile no two capital cases and no two defendants are alike, we have compared the circumstances of the present case with the circumstances of similar first degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases." Reid, 91 S.W.3d at 287. In that case, the defendant was convicted of two counts of first degree murder and sentenced to death for the killing of two Captain D's employees during the robbery of the restaurant. Furthermore, this Court upheld the defendant's sentences of death for the robbery, kidnapping, and murder of two Baskin-Robbins employees. Reid, 164 S.W.3d at 317-18. The victims in that case were transported to a nearby park and stabbed to death. Id.

This Court has repeatedly affirmed the sentence of death in other cases where the victim was shot to death during a robbery. See, e.g., Davis, 141 S.W.3d at 622; State v. Powers, 101 S.W.3d 383, 405 (Tenn. 2003); State v. Chalmers, 28 S.W.3d 913, 920 (Tenn. 2000); Van Tran, 864 S.W.2d at 482; State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992); State v. King, 694 S.W.2d 941, 947 (Tenn. 1985). In addition, we have upheld the death sentence in a number of cases where the defendant has presented similar mitigating evidence. See, e.g., Davis, 141 S.W.3d at 621; State v. Middlebrooks, 995 S.W.2d 550, 565 (Tenn. 1999); Hines, 919 S.W.2d at 584.

In our view, this case is not "'plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.'" <u>Davis</u>, 141 S.W.3d at 620 (quoting <u>Bland</u>, 958 S.W.2d at 668). Nor can we conclude that the sentence of death was imposed in any arbitrary fashion. <u>See</u> Tenn. Code Ann. § 39-13-206(c)(1)(A) (2003). In consequence, we hold that the sentences of death were not disproportionate.

**Conclusion**

The trial court did not err during the course of the trial by finding the defendant competent to stand trial; by admitting testimony that the defendant had possessed weapons similar to those used in the crimes; by denying the defendant's motion to limit proof of his financial condition; or by denying the defendant's motion to recuse. Further, the trial court did not err during the penalty phase by allowing the State to introduce evidence of the murders at the Captain D's restaurant to establish the "mass murder" aggravating circumstance. Finally, we conclude that the defendant's sentences of death are not disproportionate under the mandatory review criteria of Tennessee Code Annotated section 39-13-206(c)(1).

Accordingly, the judgment of the Court of Criminal Appeals is affirmed. The sentence of death shall be carried out on the 3rd day of January, 2008, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, the costs of this appeal are taxed to the State.

_____
GARY R. WADE, JUSTICE