# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 1, 2015 Session

## STATE OF TENNESSEE v. JEROME SANDERS

### Appeal from the Criminal Court for Shelby County
### No. 1104849    Lee V. Coffee, Judge

_____

### No. W2014-01513-CCA-R3-CD  -  Filed December 23, 2015

_____

Defendant, Jerome Sanders, was indicted for first degree murder, first degree felony murder, and especially aggravated robbery for his role in the robbery and shooting death of Martin Webster in Memphis in 2010. A jury found Defendant guilty as charged. The trial court merged the first degree murder conviction with the felony murder conviction and sentenced Defendant to life in prison for the felony murder conviction and to twenty-five years for the especially aggravated robbery conviction. The sentences were ordered to be served consecutively. In this direct appeal, Defendant raises twelve issues for review: (1) whether the trial court erred by denying a motion to dismiss the indictment based on the State's failure to preserve potentially exculpatory evidence; (2) whether the trial court erred by denying the motion to suppress Defendant's statement; (3) whether the trial court erred in denying a motion to recuse; (4) whether the trial court improperly admitted evidence of admissions made by Defendant; (5) whether the trial court improperly prevented a psychological expert from testifying at trial; (6) whether the trial court improperly admitted evidence of Defendant's prior bad acts in violation of Tennessee Rule of Evidence 404(b); (7) whether the trial court erred by allowing the State to admit evidence of an alleged oral statement of Defendant that was not provided to Defendant in discovery; (8) whether the trial court's actions resulted in a violation of Defendant's right to confrontation; (9) whether the State committed prosecutorial misconduct in its closing argument; (10) whether the trial court erred by refusing to grant a new trial when there was a juror asleep during trial; (11) whether the evidence was sufficient to support the convictions; and (12) whether cumulative error requires the reversal of his convictions. After a review of the evidence and authorities, we determine Defendant is not entitled to relief. Accordingly, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Andre C. Wharton, Memphis, Tennessee, for the appellant, Jerome Sanders.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The shooting death of Martin Webster at the Hillcrest Apartments in Memphis on September 24, 2010, led to indictments issued by the Shelby County Grand Jury in July of 2011 in which Defendant, Adrian Hendree, and Reginald Daughty were indicted for first degree murder, felony murder, and especially aggravated robbery.

Defendant was arrested on October 12, 2010, in connection with a robbery that occurred on October 10, 2010, unrelated to this case. Defendant was interviewed by the robbery division of the Memphis Police Department about his involvement in that robbery. After admitting his involvement in that robbery, Defendant was turned over to and interviewed by the homicide department. Defendant gave a statement in which he admitted to being present at the robbery and shooting of the victim in this case during which he took the victim's iPhone.

Defendant filed a pretrial motion to suppress. Defendant presented the testimony of Dr. James Walker at the hearing on the motion to suppress. Dr. Walker, a forensic neuropsychologist, met with and evaluated Defendant on August 29, 2012. Dr. Walker said that he had no doubt Defendant was of limited intelligence. Dr. Walker diagnosed Defendant as mildly intellectually disabled and concluded that he was "marginally" competent for trial. Dr. Walker also described Defendant as suggestible and noted that he was probably malingering.

The trial court ruled that the testimony failed to establish that Defendant was mentally impaired or unable to waive his *Miranda* rights. The trial court did not find the waiver to be unknowing or involuntary. Further, the trial court found that Defendant was not deprived of food or medication. Thus, the court denied the motion to suppress the statement.[1]

---

[1] A more thorough discussion of the proof presented at the hearing on the motion to suppress will be included within our review of the trial court's ruling on the motion.

The victim worked at Sharp Electronics. On the day of the incident, he was given a ride home by a co-worker. He arrived at the apartment he shared with his mother, Lisa Drapes, around 11:00 p.m. After visiting with his mother, the victim went outside to listen to music on his iPhone. Approximately ten to fifteen minutes later, unfamiliar voices were heard outside the apartment followed by several gunshots. The victim was able to tell both a neighbor and his mother that he had been shot and robbed. The victim walked away from the apartment while Ms. Drapes called the police. He was eventually taken to the hospital where he later died from a gunshot wound to the chest. The bullet pierced the victim's heart and right lung, resulting in internal bleeding. He was shot from a distance between several inches to three feet.

Several people that lived in and around the area testified at trial. In particular, Kandalicious "Kandace" Turley testified that she lived nearby in Peppertree Apartments. She knew Defendant, who went by the name "J-Roc," from her boyfriend, Corey Brown.[2] Ms. Turley recalled Defendant coming to her apartment in October of 2010 with a shotgun and handgun. He was visiting Mr. Brown and left the apartment with the handgun. Mr. Brown left the apartment with the shotgun. A few days later, Defendant returned to the apartment looking for Mr. Brown. He appeared to be injured, so Ms. Turley encouraged him to go to the hospital. Mr. Brown was in jail when Defendant returned. Mr. Brown called Ms. Turley from jail after Defendant's return to her apartment. After the telephone call from Mr. Brown, Ms. Turley located the handgun in the couch cushions and took the gun to Chasawa Smith's apartment, also located at Peppertree Apartments.

Ms. Smith acknowledged that Ms. Turley brought a handgun to her apartment in mid-October 2010. She lived above Ms. Turley. According to Ms. Smith, also known as "Precious," the side of the gun appeared broken. Ms. Turley was worried that the police were about to come to her apartment, so she put the gun on Ms. Smith's shelf. About fifteen minutes later, a man from the neighborhood known as "Pretty Boy"[3] came to get the gun.

"Pretty Boy" took the gun to Tyran Phillips's apartment, located directly above Ms. Smith's apartment. After the victim's death, Mr. Phillips was arrested by police. He informed police that the gun was stored at his house from October 16 to October 20, 2010, and that while he was being questioned by the police, someone broke into his

---

[2] Mr. Brown is the codefendant in the unrelated robbery case referenced above for which Defendant was under arrest at the time he was questioned on the charges in this case.

[3] "Pretty Boy's" legal name is unclear form the record.

apartment and took the gun. Mr. Phillips consented to a search of his apartment. The gun was eventually located in a drainage ditch in the apartment complex.

The gun was tested for fingerprints. No viable prints were recovered from the weapon. Special Agent Cervinia Braswell, a firearms expert with the Tennessee Bureau of Investigation, examined the weapon, the shell casing located at the crime scene, and the bullet recovered from the victim's body. The gun was difficult to test fire because of debris in the barrel. It was clogged with dirt and rust. Agent Braswell concluded that the shell casing was fired through the gun but was unable to conclusively determine if the bullet recovered from the victim's body was fired through that weapon.

During the investigation, surveillance video from the apartment complex was shown to the authorities by Sarah Tate, the manager of Hillcrest Apartments. The video footage was black and white and showed three black males walking around the building. The men approached a staircase. One person stood at the bottom of the staircase while one or two of the men walked up to the second level, stood there for several minutes, and then walked down the stairs and out of view. The video was not clear enough to capture faces or facilitate identification and did not capture the shooting on the video. The police did not collect the video due to the lack of evidentiary value.

Deangelo Steen, a resident of PepperTree Apartments who was acquainted with Defendant, Mr. Brown, and Ms. Turley, testified at trial. Prior to his testimony, defense counsel requested a jury out hearing under Tennessee Rule of Evidence 404(b) to determine whether the testimony he was about to give was admissible. The trial court denied the request for the hearing. Mr. Steen testified that he observed Ms. Turley pass her telephone to Defendant so that Defendant and Corey Brown could speak to each other. Mr. Steen testified that he could hear Mr. Brown's voice on the other end of the phone. Mr. Steen could not hear their entire conversation but overheard Defendant talking to Mr. Brown about getting a gun out of Mr. Brown's apartment. Defense counsel objected again, arguing that the testimony by Mr. Steen about what he heard Mr. Brown tell Defendant on the phone and Defendant's reaction to that conversation were hearsay. The trial court again overruled the objection. Mr. Steen testified that when Defendant handed the phone back to Ms. Turley, Mr. Steen heard Defendant say, "[Mr. Brown] was talking about a n[***] can't go back to his house no more and all that." Mr. Steen also said Defendant "was like, 'Bro, [Mr. Brown said] get them guns out of the house. Get them guns out of my house, bro, 'cause the police looking for us, bro.'"

Defendant's statement to the police was admitted at trial during the State's case-in-chief. In the statement, he admitted that he was present during the robbery and shooting of the victim and that he took the victim's iPhone.

Defendant attempted to call Dr. Walker to testify on his behalf. The trial court excluded the testimony.

At the conclusion of the proof, the jury found Defendant guilty as charged in the indictment. He received an effective sentence of life imprisonment plus twenty-five years. The trial court merged the first degree murder conviction into the felony murder conviction. After the denial of a motion for new trial, Defendant appealed, raising twelve issues for our review.

*Analysis*

*I. Motion to Recuse*

At the outset, Defendant argues that the trial court should have granted his motion to recuse based upon the court's "repeated demeanor and numerous adverse rulings" that "could be reasonably perceived as bias towards Defendant and his counsel" and the "contentious" relationship between the court and defense counsel. The State argues that Defendant has waived the issue. We agree with the State.

The record reflects that the appellant filed a motion on April 17, 2014, almost one month after the jury convicted Defendant, and that the trial court found the motion to be untimely. "A motion for recusal should be filed when the facts forming the basis of that motion become known." *Bean v. Bailey*, 280 S.W.3d 798, 803 (Tenn. 2009) (citing *Davis v. Tenn. Dep't of Emp't Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999)). Furthermore, a defendant's failure to file a motion to recuse in a timely manner may result in a waiver of his or her complaint about the judge's impartiality. *Id.*

Defendant's complaints about the trial court's conduct and demeanor stem from things that took place during the trial, yet Defendant waited until after the trial to file his motion. Therefore, we agree that the motion was untimely and that the issue has been waived. *See* Tenn. R. App. P. 36(a).

*II. Motion to Suppress*

Defendant argues on appeal that his statement should have been suppressed because his intellectual disability and marginal competence "rendered him highly suggestible." Additionally, Defendant contends that he was in pain and subjected to a lengthy interrogation during which he was hungry. Additionally, Defendant suggests that the officers utilized "unlawfully coercive tactics" which rendered his statement unknowing and involuntary. The State disagrees.

As discussed briefly above, Defendant filed a pretrial motion to suppress his October 12, 2010 statement. In the motion, Defendant alleged that his limited intelligence prevented him from knowingly, intelligently, and voluntarily waiving his rights. He also alleged that during his police interview he was under the influence of an intoxicant and in "excruciating" pain from a recent gunshot wound and that the "overall circumstances" of his interrogation supported suppression.

The trial court held a hearing on the motion. At the hearing, the trial court learned that Defendant was arrested and first interviewed by Sergeant André Pruitt with the Memphis Police Department in connection with his involvement in an unrelated robbery. At that time, Sergeant Pruitt advised Defendant of his *Miranda* rights, and Defendant signed a waiver of rights form. Defendant eventually signed a statement in which he admitted involvement in the unrelated robbery. At some point during the interview, Defendant made reference to the robbery and shooting death of the victim in this case. Sergeant Pruitt contacted the homicide department and notified them that Defendant was in custody. While being interviewed, Defendant complained of pain and was given two Aleve gel caps. After the interview concluded in the robbery department, Defendant was interviewed by Lieutenant Vivian Murray and Sergeant Robert Wilkie of the homicide department.

Defendant was given *Miranda* warnings at approximately 3:55 p.m. and began talking with the homicide department at 7:15 p.m. Because Defendant had already been advised of and waived his rights at the robbery department interview, which immediately preceded the interview with the homicide department, Defendant was not given his rights again at the beginning of the interview with the homicide department. Neither Lieutenant Murray nor Sergeant Wilkie felt that Defendant appeared to be under the influence of intoxicants. Further, neither officer described Defendant as agitated.

Defendant informed the officers that he was high for several days before the homicide. However, Defendant also told the officers that he was shot and that the gunshot wound "blew the high out of him." Up to this point, the officers were unaware that Defendant had a gunshot wound. Defendant did not complain of pain during the interview but occasionally appeared "restless" as if he did not want to be there. Approximately two hours after starting the interview in the homicide department, the officers took a break to get Defendant something to eat.

Defendant was described as "cooperative." Lieutenant Murray did not threaten Defendant or make any promises of leniency during the interview. At the time of the interview, Lieutenant Murray was under the impression that there were witnesses to the shooting and robbery. She informed Defendant of such in hopes of getting a confession or truthful statement. She did not perceive him to be "slow." The interview was not recorded or videotaped as this was the policy of the Memphis Police Department.

Sergeant Robert Wilkie of the Memphis Police Department testified that he assisted Lieutenant Murray with the homicide interview on October 12. Sergeant Pruitt had advised Defendant of his rights, so Sergeant Wilkie and Lieutenant Murray did not re-advise him of his rights. Sergeant Wilkie said he did not know that Sergeant Pruitt had given Defendant pain medication in the robbery department. He said that Defendant "made no complaints or seemed to be out of sorts" and that he "appeared normal." Sergeant Wilkie also said that Defendant "seemed to communicate okay, and he appeared to read well and speak well."

On cross-examination, Sergeant Wilkie testified that Defendant did not indicate that he was confused or did not understand what was happening. Defendant never said he was in pain. At some point during the interview, Defendant was told that there was videotape evidence of the homicide from the apartment complex at which the shooting occurred. During cross-examination, one of the prosecutors acknowledged that there was a surveillance camera at the apartment complex; that police came to the apartment complex and viewed the video evidence; and that Memphis Police Department was never actually able to obtain the video evidence from the apartment complex.

At the conclusion of the interview, Defendant's statement was reduced to writing. Defendant was able to read the statement, initial each page, and sign the statement. Defendant admitted to being present at the robbery and shooting of the victim during which he took the victim's iPhone. A portion of the statement describes the events of the evening as follows:

> I was standing out that night with the guys I be with and I was talking about robbing somebody at the time, but the guys I was with, they wasn't with that. But Dee was. So we left the Pepper Tree and we were headed towards Hillcrest and we both was looking for someone to rob, but he found somebody before I could. He picked up a black and mild[4] off the ground. We knew that was the only way to get close to him cause we didn't have a lighter. We knew that he had one cause he was smoking weed. Dude had his phone out listening to some music and he was upstairs. So that's when Dee drawed [sic] the gun. So Dee held the gun on him and asked him if he had some money. Dee pointed the gun at his face and asked him did he have some money on him and he said "Naw." Dee didn't believe him. I was leaving down the steps. Dee tried to shoot him the first time, but the gun just clicked. I think it was [the] safety. So Dee got down the stairs a little bit, took it off safety and then he shot once. You could tell the dude was shot cause he was holding his chest and had one hand on the

---

[4] A black and mild is a type of cigar.

rail. He was trying to come down the steps. Then Dee got by the car and he shot again. Then I took off to running. We both panicked. Dee didn't know where to go though and I showed him where the hole in the cut was. We ran back toward Pepper Tree way. Dee went his way and I went my way. I thought it was gonna be like a normal day. I didn't think he was gonna die like that cause I didn't know he was dead until I heard somebody say somebody got killed in the Hillcrest. I didn't think nobody knew about that.

After the robbery, Defendant told his uncle about what happened and his plans to sell the phone for money. His uncle advised him to break the phone because it contained a "tracking" device. Defendant "wanted to sell it" because he needed money. His uncle gave him money, so Defendant broke the phone and threw it away in the trash.

Dr. James Walker testified for Defendant at the hearing on the motion to suppress. Dr. Walker testified that he was a forensic neuropsychologist, which he described as "simply a clinical psychologist who has additional training and experience in dealing with brain dysfunction and brain disease." Dr. Walker met with and evaluated Defendant on August 29, 2012. Prior to the evaluation, Dr. Walker reviewed Defendant's school, medical, mental health, and jail records. Dr. Walker said that at seven years old, the appellant's IQ was thirty-two, which "put [him] in the bottom first percentile." Defendant's overall score on the adaptive function scale improved to sixty-three several years later, which indicated that "he's still having very serious trouble in just doing the basic day-to-day tasks that everyone has to do to get by." In 2005, Defendant was administered the Test of Nonverbal Intelligence in juvenile court and scored eighty-three, which was slightly below average. Dr. Walker stated that Defendant's score "[did not] match with all the other numbers that we see with [Defendant] over the years" but that the Test of Nonverbal Intelligence was "not a very good test for estimating a person's overall intelligence level." Dr. Walker said that he had no doubt Defendant was of limited intelligence and that his meeting with Defendant "simply confirmed that, both in terms of my observations and my testing of him." Dr. Walker diagnosed Defendant as mildly intellectually disabled and concluded that he was "marginally" competent for trial.

Dr. Walker testified that he reviewed Defendant's statement to Sergeant Pruitt. Dr. Walker said that the statement took him "about twenty seconds" to read and that he wondered what else happened during the interivew "besides just those simple questions and answers that were there." Defendant told Dr. Walker that the officers were very coercive and threatening and that he was intoxicated when he gave the statement. Dr. Walker acknowledged that Defendant told the officers he was not intoxicated. Dr. Walker noted Defendant was shot in the arm three days before his interview with Sergeant Pruitt and was given a prescription for hydrocodone after being shot. Although Defendant told Segeant Pruitt that he did not take any medication on the day of his

interview, Defendant told Dr. Walker that he had taken four hydrocodone pills. Dr. Walker stated, "You take a man of limited intelligence and you bathe that same brain in alcohol and drugs, it's functioning even less efficiently, so he's even less able to make decisions and to think independently in a reasonable, rational fashion." Dr. Walker stated that "people aren't at their best when they're hungry and tired" and that "certainly, that might have had some bearing on his mental state." Dr. Walker concluded Defendant was "easily led" and "very suggestible." Dr. Walker opined that if Defendant was placed "in a room with people who are smarter and brighter and stronger willed than he is, the reliability of what comes out of that room might be influenced by the people who are questioning him."

On cross-examination, Dr. Walker acknowledged that Defendant maintained that he was not the shooter in this case even though he presented as being susceptible to other people's suggestions. Dr. Walker stated as follows with regard to Defendant's waiver of rights:

> I don't see any information that says that he was not able to intelligently and voluntarily waive his rights. I just don't think that his intelligence and knowingness is that of the average person. He's a very limited person, who in that context was waiving those rights as best as he could under the circumstances.

Dr. Walker described Defendant as "grossly dishonest" with him. Specifically, Defendant lied about when he was shot and whether he was under the influence during his police interviews. Dr. Walker said Defendant was malingering, "appeared to be very determined to be deceptive with me," and put forth a poor effort throughout the examination. Dr. Walker said that Defendant "seemed to be wanting to appear to be very impaired with regard to his memory, that he just didn't understand things, that he didn't remember things, he could remember from one moment to the next what he had been told."

On redirect examination, Dr. Walker testified that a lot of people malingered during their evaluations. He said that he factored malingering into his opinions and that "it doesn't change any of them."

The trial court ruled that the testimony failed to establish that Defendant was mentally impaired or unable to waive his *Miranda* rights. The court noted that nothing indicated Defendant was experiencing "excruciating" pain from his gunshot wound at the time of his interviews and that Dr. Walker testified that Defendant was competent and capable of waiving his rights. The trial court acknowledged Defendant's low IQ but stated that the evidence failed to show that his IQ was so low that it prevented him from being able to waive his rights knowingly, intelligently, and voluntarily. The trial court

also noted that the detail of the statement "belie[d]" Defendant's assertion that he was under the influence at the time of the statement. The trial court found that Defendant was not deprived of food or medication and that he was "given what he asked for." Thus, the court denied the motion to suppress the statement.

On appeal, the losing party bears the burden of demonstrating that a trial court's decision concerning a motion to suppress was erroneous. *State v. Harts*, 7 S.W.3d 78, 84 (Tenn. Crim. App. 1999). We review a trial court's decision concerning a motion to suppress under the standard established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). *See R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008). As our Supreme Court explained in *Odom*, with respect to a trial court's factual findings:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

*Odom*, 928 S.W.2d at 23. "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). "[O]ur review of a trial court's application of law to the facts is conducted under a de novo standard of review." *R.D.S.*, 245 S.W.3d at 362.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the

waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). In this case, Defendant claims that his mental infirmities prevented a voluntary, knowing, and intelligent waiver and that the statements he made during his custodial interrogations were involuntary because they were the product of psychological coercion.

The voluntariness of a confession "remains distinct from *Miranda*." *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 434-35). Because "coerced confessions are inherently unreliable," only voluntary confessions may be admitted as evidence. *Id*. (citing *Dickerson*, 530 U.S. at 433). It has long been held that for a statement to be voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith*, 933 S.W.2d at 455. Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id*. (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)); *see also State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) ("for a confession to be involuntary, it must be the product of coercive state action"). However, "[p]romises of leniency by state officers do not render subsequent confessions involuntary *per se*: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency.'" *Smith*, 933 S.W.2d at 455 (emphasis in original) (quoting *Kelly*, 603 S.W.2d at 729). The determinative question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *Kelly*, 603 S.W.2d at 728 (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)); *see also Climer*, 400 S.W.3d at 568 ("[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion.") (citing *Dickerson*, 530 U.S. at 433-35; *Smith*, 933 S.W.2d at 455).

In order to determine the voluntariness of a statement, a court must "examine the totality of the circumstances surrounding the giving of a confession, 'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434); *see also Monts v. State*, 400 S.W.2d 722, 733 (Tenn. 1966). Factors relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary

delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)); *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (recognizing that no single factor is necessarily determinative).

In the present case, Defendant was twenty years old when he gave his statement. He dropped out of high school prior to graduation but was not illiterate. Sergeant Pruitt advised Defendant of his rights, Defendant signed a waiver of rights form, and Dr. Walker concluded that, although Defendant had a low IQ, he was intelligent enough to understand his rights and waive them. Sergeant Pruitt testified that Defendant never indicated that he did not understand his rights. Lieutenant Murray and Sergeant Wilkie, who interviewed Defendant shortly after Sergeant Pruitt, also testified that Defendant seemed to understand what was happening. Defendant was familiar with the criminal process—the presentence report indicated a lengthy criminal history, including numerous convictions of simple assault. Defendant gave his statement a few hours after his arrest and told the officer that he was not intoxicated or physically ill. Defendant did not complain of pain, despite being given pain medication by the officer from the robbery department. Defendant was given food and drink, and the officers took a break from questioning to allow Defendant to eat. There is no indication that Defendant was physically abused, and the officers denied threatening Defendant. In short, the *Huddleston* factors do not weigh in favor of finding that Defendant's statements were unknowing, unintelligent, or involuntary.

Defendant also argues that this case is analogous to *State v. Phillips*, 30 S.W.3d 372 (Tenn. Crim. App. 2000). In *Phillips*, the defendant was interviewed by two investigators with the Department of Children's Services about allegations of sexual misconduct with his stepdaughters. *Id.* at 374. This Court affirmed the trial court's finding that the defendant's incriminating statement was involuntary based on the following factors: "(1) misrepresentations by an investigator [about having DNA evidence against the defendant], (2) numerous steadfast denials by the defendant, (3) statements that law enforcement officials would be involved if the defendant did not confess, and (4) promises of treatment for the defendant and his stepdaughter only if he fully confessed." *Id.* at 377.

However, this case is distinguishable from *Phillips*. In that case, charges had not been filed against the defendant, and the defendant was not in custody nor given any *Miranda* warnings. Therefore, it was reasonable for the defendant to believe the

investigator's promise that law enforcement would not be involved if he confessed. In this case, law enforcement was already involved: Defendant was under arrest for robbery and homicide charges, he was sitting in an interview room, and he was talking to multiple detectives. Moreover, Defendant was read his *Miranda* rights by the officer in the robbery department, and Defendant signed a waiver form. Defendant insists that officers made misrepresentations about the evidence, arguing that the officers' threats of eyewitness and videotape evidence that did not exist were unnecessarily coercive. We determine the officers did not make any intentional misrepresentations to Defendant about the evidence in the case. The officers made mention of a videotape and potential eyewitness because that was the information they had before them at the time of the interrogation. Looking at the totality of the circumstances, we determine the trial court did not err in denying the motion to suppress.

### III. Motion to Dismiss Indictment

In a related issue, Defendant contends that the trial court erred when it failed to grant Defendant's motion to dismiss the indictment for failure to preserve potentially exculpatory evidence which ultimately denied Defendant a fair trial. Specifically, Defendant insists that the Memphis Police Department had a duty to preserve the video footage from the apartment complex. The State counters that the proof established the video evidence, even if preserved, was not exculpatory. Therefore, the State was under no duty to preserve it.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides every defendant the right to a fair trial.[5] To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. *United States v. Agurs*, 427 U.S. 97, 110-11 (1976).

The State has a general duty to preserve all evidence subject to discovery and inspection as part of Tennessee Rule of Criminal Procedure 16. The case of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), cited by Defendant to support his argument, illustrates the procedure used by courts to examine situations in which the State fails to preserve evidence. In *Ferguson*, the defendant was arrested for driving under the influence ("DUI"). The videotape of various sobriety tests performed by the defendant

---

[5] "As a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." *State v. Ferguson*, 2 S.W.3d 912, 914 n.3 (Tenn. 1999) (citing *Betts v. Brady*, 316 U.S. 455, 462 (1942); *Watkins v. State*, 393 S.W.2d 141, 144 (Tenn. 1965); *Lofton v. State*, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994)).

was inadvertently recorded over before his trial. *Id.* at 914. The defendant appealed, arguing that the State violated his due process rights by failing to preserve the videotape.

The Tennessee Supreme Court has observed that "the due process required under the Tennessee Constitution [is] broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *State v. Merriman*, 410 S.W.3d 779, 784-85 (Tenn. 2013) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")). Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

Our state supreme court adopted a test for courts to use in determining whether the loss or destruction of evidence has deprived a defendant of a fair trial. *Ferguson*, 2 S.W.3d at 917. The first step is to determine whether there was any duty to preserve evidence:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). The court explained that if the proof demonstrates the existence of a duty to preserve the evidence and demonstrates that the State failed in that duty, "the analysis moves to considerations of several factors which guide the decision regarding the consequences of the breach." *Id.* Those factors include: "(1) The degree of negligence involved; (2) The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) The sufficiency of the other evidence used at trial to support the conviction." *Id.* If, after considering all the factors, the trial judge concludes that a trial without the missing evidence would not be fundamentally fair, the trial court "may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the "missing" evidence under a de novo standard of review. *Id.* at 791. If this Court concludes that the trial would be fundamentally unfair in the absence of the lost evidence, this Court will apply an abuse of discretion standard to review the appropriateness of the remedy imposed by the trial court. *Id.* at 792.

To begin our analysis, we look to whether the State had a duty to preserve the evidence. The evidence must have had, according to *Ferguson,* "an exculpatory value that was apparent before the evidence was destroyed." Additionally, the evidence has to be unobtainable by other "reasonably available means." 2 S.W.3d at 917 (quoting *Trombetta*, 467 U.S. at 488-89). In this case, from the proof presented, it does not appear that the videotape from the surveillance videos was the type of exculpatory evidence which the State had a duty to preserve under *Ferguson*. According to the testimony of the apartment manager, the videotape was black and white and only showed the backs of three figures approaching the steps near the victim's apartment on the night of the shooting. No faces could be seen and no persons could be identified. Officers watched the videotape at the office and made the determination that a copy of the videotape was not necessary. Nothing from the tape was beneficial to Defendant's case. In other words, a trial without the videotape would not be, in our view, fundamentally unfair. Moreover, Defendant could have obtained a copy of the tape himself via a subpoena sent to the apartment complex. Because we determine that the State was under no duty to preserve the evidence, it becomes unnecessary to apply the *Ferguson* factors or to determine, as Defendant suggests, whether the trial court should have imposed an appropriate remedy such as issuing a jury instruction on missing evidence. Defendant is not entitled to relief on this issue.

## IV. Evidentiary Issues at Trial

### A. Hearsay Testimony of Deangelo Steen

Next, Defendant challenges the trial court's ruling on the admissibility of the testimony of Deangelo Steen. Specifically, Defendant complains that Mr. Steen's testimony did not meet the hearsay exception relied upon by the trial court, a statement of a co-conspirator, and that the trial court did not require the foundation for the admissibility of the evidence to be placed on the record as required by *State v. Walker*, 910 S.W.2d 381, 385 (Tenn. 1995). The State disagrees, noting that the trial court admitted the statements of Defendant as overheard by Mr. Steen as an admission by a party opponent and the statements of Mr. Brown to Defendant as overheard by Mr. Steen as a statement made by a co-conspirator in furtherance of a conspiracy.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802. Whether a statement constitutes hearsay and whether it falls under one of the exceptions to the hearsay rule "are questions of law subject to a de novo review." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*, 2015 WL 5032354 (U.S. Oct. 13, 2015). If a hearsay statement contains additional hearsay, both portions must qualify for an exception to the hearsay rule in order to be admissible. Tenn. R. Evid. 805.

As relevant to the issues herein, Tennessee Rule of Evidence 803(1.2) provides:

> Admission by Party-Opponent. A statement offered against a party that is (A) the party's own statement in either an individual or a representative capacity, . . . or (E) a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy. . . . An admission is not excluded merely because the statement is in the form of an opinion. Statements admissible under this exception are not conclusive.

Tenn. R. Evid. 803(1.2).

At trial, Mr. Steen testified about a telephone conversation he overheard between Mr. Brown and Defendant. Mr. Steen testified that he was standing next to Defendant and could hear Mr. Brown's voice on the other end of the phone even though he could not hear what he was saying. He recognized Mr. Brown's voice because he was familiar with the voice and spoke to him regularly. At some point during the conversation, Mr. Steen heard Defendant say something about getting guns out of Mr. Brown's residence. Mr. Steen testified, over objection, that when the conversation was over, Defendant commented that "[Mr. Brown] was talking about a n[***] can't go back to his house no more and all that." Mr. Steen also said Defendant "was like, 'Bro, [Mr. Brown said] get them guns out of the house. Get them guns out of my house, bro, 'cause the police looking for us, bro.'"

Clearly, both of these statements are hearsay. This is not disputed by the State or Defendant. Defendant disputes the trial court's admission of the statements. The trial court admitted the statements of Defendant as an admission by a party opponent and the statements by Defendant attributed to Mr. Brown as statements by a co-conspirator in furtherance of a conspiracy. On appeal, Defendant complains that the trial court treated Mr. Steen as the co-conspirator, there was no testimony that the conspiracy was "ongoing," and the trial court failed to comply with *Walker* to show that there was a conspiracy.

In *Walker*, the defendant was convicted of murder and robbery and argued on appeal that the trial court had erred in admitting statements made by co-conspirators after

- 16 -

the offenses had occurred. The court noted that "a conspiracy is, in general terms, a combination of two (2) or more persons, by concerted action, to accomplish some criminal or unlawful purpose." *Walker*, 910 S.W.2d 384. In discussing the scope of Rule 803(1.2)(E), the court commented:

> For a statement of the co-conspirator to be admissible it must have been made "during the course of" the conspiracy which means that the conspiracy must have been ongoing at the time the statement was made. If the conspiracy *had not yet begun or had ended* when the statement was made, the declaration is not admissible under this hearsay exception, although it may still be admissible under some other exception. . . .

*Id.* at 385 (emphasis added).

Since then, the supreme court has commented that *Walker* stands for the proposition that there is no bright-line test or precise definition for determining whether a statement has been made during the course of the conspiracy. *State v. Henry*, 33 S.W.3d 797 (Tenn. 2000). "The commission of the offense that was the goal of the conspiracy does not necessarily end the conspiracy, nor does it preclude the possibility that the conspiracy encompassed later statements regarding concealment of the offense." *Id.* at 803 (citing *Walker*, 910 S.W.2d at 385). Moreover, "the commission of the offense also does not imply that the conspiracy automatically included all later statements pertaining to the concealment of the offense." *Id.* Thus, Tennessee Rule of Evidence 803(1.2)(E) requires that a court examine all of the factors and circumstances of the case in order to determine whether a statement of a co-conspirator is admissible. *Id.*

A conspiracy is defined in § 39-12-103 as occurring when:

> two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.
>
>    . . . .
>
> (e)(1) Conspiracy is a continuing course of conduct that terminates when the objectives of the conspiracy are completed or the agreement that they be completed is abandoned by the person and by those with whom the person conspired. The objectives of the conspiracy include, but are not limited to, escape from the crime, distribution of the proceeds of the crime, and measures, other than silence, for concealing the crime or obstructing justice in relation to it.

The trial court determined that the statements of Defendant were admissible as an admission by a party-opponent. As to the statements of Mr. Brown to Defendant, the trial court determined they were statements by a co-conspirator during the course of or in furtherance of the conspiracy. The trial court did not, as alleged by Defendant, determine that Mr. Steen was the co-conspirator whose statements were admissible The trial court noted that the statements about the conspiracy "if true, is contextual background information that would go to show things that the State of Tennessee ha[s] to prove" such as intent and the "potential destruction of evidence" that the jury can use to infer a consciousness of guilt. Thus, the trial court determined that there was an ongoing conspiracy between Defendant and Mr. Brown such that Mr. Brown's statements about the removal of the guns was admissible.

These statements fit within the hearsay exceptions utilized by the trial court. Defendant is a party-opponent, so his statements were admissible. Mr. Brown's statements were made during a conspiracy to conceal evidence of the crime, so his statements were also admissible. Defendant is not entitled to relief on this issue.

### B. Threats by Defendant's Family Members to Mr. Steen

In a somewhat related issue, Defendant complains that the trial court allowed Mr. Steen to testify about alleged threats made in the hallway outside the courtroom.[6] Specifically, Defendant insists that the testimony was not relevant, highly prejudical, and admitted without any proper basis for admission. The State counters that the testimony was relevant to the witnesses' credibility and that the trial court did not abuse its discretion in admitting the evidence.

During direct examination of Mr. Steen, counsel for the State asked the witness if he came to testify because he wanted to be there or because he was "subpoenaed to be [at trial]." Mr. Steen admitted that he was there because of a subpoena. Mr. Steen was asked if there were "people giving [him] a hard time" out in the hall prior to his testimony. He replied, "Yes." Defense counsel objected on the basis of relevance. The trial court overruled the objection, noting that it would charge the jury on credibility. Mr. Steen went on to testify that the comments made in the hallway made him feel "uncomfortable" but that the antagonist was not in the courtroom. Mr. Steen testified that he told the truth about Defendant in his testimony. On redirect, the State asked Mr. Steen to describe the threatening person. Mr. Steen testified that the man was wearing a purple

---

[6] We are somewhat confused as to why Defendant placed this issue in his brief with all the issues related to the admissibility of "prior bad acts" under Tennessee Rule of Evidence 404(b), as there was no testimony that the threats came from or were orchestrated by Defendant and, therefore, could not be a prior bad act of Defendant. For that reason, we have chosen to address this issue without the application of Rule 404(b).

shirt and was not in the courtroom at that time. Defense counsel objected a second time on the basis of relevance. The trial court commented as follows:

> [A]gain, I will overrule the objection. The charge that the court has to give the jury when they consider the credibility of witnesses, one of the nine factors that they can consider is have there been any promises, threats, suggestions, or other influences that affected how the witness testified. That is one of nine things that will be charged.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000) (citing *State v. Gentry*, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes). We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

The State presumably questioned the witness about the threats for the purpose of bolstering the credibility of the witness by showing a lack of bias in favor of Defendant. The feelings that a witness has with regard to a party or issue are an important factor for the trier of fact to consider in assessing the weight to be given to the witness's testimony. N. Cohen, D. Paine, and S. Sheppeard, *Tennessee Law of Evidence* § 612 (2nd ed.1990). The law in Tennessee has long been that such evidence is admissible.[7] As early as 1905, our supreme court proclaimed:

> It is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other, in order that the jury may judge of his credibility and the trustworthiness of his testimony. It is the experience of trial courts that witnesses are often as much influenced in testifying by feelings of friendship or hostility to parties to the case as by direct pecuniary interest in the result of the trial. . . .

---

[7] This type of evidence is different from evidence offered as impeachment by bias or prejudice. Admissibility of this type of evidence is governed by Tennessee Rule of Evidence 616. That rule provides as follows: "A party may offer evidence by cross-examination, extrinsic evidence or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616.

*Creeping Bear v. State*, 87 S.W.653, 654 (Tenn. 1905); *see also State v. Lewis*, 803 S.W.2d 260, 261 (Tenn. Crim. App. 1990); *State v. Horne*, 652 S.W.2d 916, 918-19 (Tenn. Crim. App. 1983). In this case, the trial court permitted the State to question the witness about threats made prior to his testimony by unnamed, unidentified people out in the hallway outside the courtroom. The trial court properly instructed the jury that they were to assess the credibility of the witnesses at trial. There was no error, and Defendant is not entitled to relief on this issue.

## C. Rule 404(b) Issues

Defendant complains about several instances during the trial where the trial court allegedly allowed irrelevant and inadmissible proof about Defendant's prior bad acts to be admitted into testimony.

"Evidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." Tenn. R. Evid. 404(b); *State v. Parton*, 694 S.W.2d 299, 654 (Tenn. 1997). "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). Yet, such evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme" or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013). Other act evidence may be admitted for these purposes only after the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (2013).

Tennessee's Rule 404(b) establishes more stringent safeguards for ensuring proper introduction of this kind of evidence than its federal counterpart. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002) (citing *State v. McCary*, 922 S.W.2d 511, 514 (Tenn.

1996)); *compare* Tenn. R. Evid. 404(b) *with* Fed. R. Evid. 404(b). Our rule has been aptly described as one of "exclusion" rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (citing *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). Consequently, "[t]rial courts have been encouraged to take a restrictive approach of Rule 404(b) because 'other act' evidence carries a significant potential for unfairly influencing a jury." *Id.* (internal quotation and citation omitted). This is particularly true where the other act sought to be introduced is substantially similar to the crime for which a defendant is being tried. *McCary*, 119 S.W.3d at 243.

A trial court's decision to admit or exclude evidence under Rule 404(b) is reviewed by an abuse of discretion standard, if the trial court has substantially complied with the procedure mandated by the Rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party." *Jones*, 450 S.W.3d at 891 (internal quotation and citation omitted). Where the trial court has failed to substantially comply with the procedural dictates of Rule 404(b), the standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-653)). Appellate court review of the issue of admissibility is confined to the evidence presented to the trial court during the jury-out hearing. *DuBose*, 953 S.W.2d at 653.

### 1. Kandace Turley

Defendant complains on appeal that the testimony of Ms. Turley about the possession of multiple firearms by Defendant and about a "suspect who was not even listed in the indictment at trial" being in jail and having guns in his possession was "confusing and vague" as well as "highly prejudicial" propensity evidence. Defendant also complains that he requested and did not get a jury-out hearing on the matter. The State, on the other hand, insists that the trial court properly admitted the testimony, which "did not involve prior bad acts, but instead placed [Defendant] in possession and control of the murder weapon."

At trial, Ms. Turley testified that she lived at Peppertree Apartments during October of 2010 by herself. At the time, she was dating Mr. Brown. Ms. Turley explained that she could not remember the exact day on which the events occurred, but she remembered Defendant came to the apartment to see Mr. Brown in October about one week before Mr. Brown went to jail. Defendant had two guns with him—"a big shotgun and a small handgun." Defendant was at the house for thirty minutes before leaving with Mr. Brown. They took the weapons with them.

At that point and at a bench conference, defense counsel objected on the basis that the State was "seeking to use this witness as evidence in two cases for totally inconsistent theories."[8]  Defense counsel asked for a "404 hearing" because of his concern that Ms. Turley was "going to start talking about a different scenario, which is highly prejudicial" because she was talking about "guns, plural" and there was "no evidence that there were multiple guns in this case. . . ."  The trial court commented that there would not be a ruling on what the State "might do" with a witness.  The trial court went on to say:

> [The State] has been instructed, and [the State] indicated that [it]'s not going to introduce any evidence of any other crimes.  And if she believes that she can put a gun in the hand of [Defendant] that may have been used in a homicide, she certainly has a right to do that.  By inference, if a jury can conclude that the gun may have been used, I can't tell the State that if you use evidence in one case, you can't use it in another case if the evidence is somehow intermingled.
>
>   I think the objection in a robbery case was that you thought Ms. Turley was a witness on a homicide, and that's the objection in the other case, that she should not be allowed to testify in the robbery case.  What your objection is, I want you to speculate as to what [the State] might do because I'm speculating and I want to object.

Defense counsel asked that the trial court "rule on our request with an out of jury hearing" to try "to prevent,  . . . , anything prejudicial from getting in the hearing of this jury."  The trial court denied the request.

Ms. Turley's testimony continued.  She saw Defendant leave with the small handgun.  He came back a few days later, alone and "hurt."  He sat on the couch; she told him he needed to go to the hospital.  She called an ambulance, but Defendant left before the ambulance came to get him.  Defendant came over a few days later to see Mr. Brown.  This occurred prior to Mr. Brown getting "locked up."

Once Mr. Brown was "locked up," he called Ms. Turley from jail.  After that phone call, Ms. Turley found the small handgun in a couch cushion and gave it to a neighbor named Precious who knew Mr. Brown.  Ms. Turley testified that she never saw anyone but Defendant with the gun.

---

[8] Defense counsel alluded to Ms. Turley's testimony in the unrelated robbery trial at which Defendant and Mr. Brown were implicated as the perpetrators.  Apparently, at that trial, Ms. Turley also testified about the guns being brought to the apartment.  Defendant was ultimately convicted in that case of aggravated robbery.  That conviction is currently on appeal before another panel of this Court.  *See State v. Jerome Sanders*, No. W2014-00989-CCA-R3-CD, 2015 WL _____ (Tenn. Crim. App. _____).

On appeal, Defendant complains that the trial court never held the hearing as requested by Defendant and required by Tennessee Rule of Evidence 404(b). The trial court ruled that 404(b) was not implicated because the State was not offering other bad act evidence.

The Tennessee Supreme Court has interpreted Tennessee Rule of Evidence 404(b) to apply only to "bad acts." *State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014). Accordingly, testimony about behavior which is relevant and which does not constitute a crime or bad act is not analyzed under the Rule. *State v. Reid*, 213 S.W.3d 792, 814 (Tenn. 2006). However, behavior that, while not criminal, constitutes a "moral 'wrong'" must meet the strictures of Rule 404(b). *Clark*, 452 S.W.3d at 289 (categorizing possession of pornography as potentially being perceived as a "moral wrong" by some members of society). Possession of a handgun and knife are not "bad acts" requiring the application of the Rule. *Reid*, 213 S.W.3d at 814 ("The testimony that Roberts saw the defendant in the possession of weapons similar to those used in the crimes did not necessarily constitute evidence of a bad act."); The State argues that Defendant's possession of a handgun and concealment of that same gun at Ms. Turley's apartment was "not evidence of prior bad acts or crimes, but was extremely relevant."

We agree with the conclusion that the evidence does not constitute evidence of a prior bad act. Therefore, the trial court's failure to substantially comply with the procedural requirements of Rule 404(b) by not having a jury-out hearing, not stating on the record the purported bad act's relevance to a material issue or not weighing the probative value of the evidence against the unfair prejudicial effect, is not error. Defendant is not entitled to relief on this issue. As an additional matter, we note that the tesitmony about the shotgun was irrelevant and could have been excluded by the trial court. However, introduction of this evidence was not prejudicial, so any error in including evidence about the shotgun was harmless.

### 2. *Testimony of Sergeant Pruitt*

Defendant next takes issue with the testimony of Sergeant Pruitt. Specifically, Defendant insists that Sergeant Pruitt's testimony that he was the "robbery" investigator and that he was working a "number of cases" in October of 2010 was "replete with undue prejudice to Defendant" because the jury was allowed to hear about various bad acts and wrongs of Defendant that were separate from the crime for which Defendant was on trial. To support his argument, Defendant cites *State v. Jeff Carter*, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212 (Tenn. Crim. App. Dec. 16, 2010), *no perm. app. filed*. The State posits that because Sergeant Pruitt never testified regarding any prior bad acts of Defendant, his claim is without merit.

- 23 -

Defendant complains that, during the direct examination of Sergeant Pruitt by the State, the following occurred:

[Counsel for State]: And when you talked to [Defendant], did he start talking to you about things of which you were not aware?

[Witness]: Yes, ma'am.

[Counsel for State]: Tell the jury what he was talking to you about that you weren't aware.

[Court]: And Sergeant Pruitt, if you will, when [the State] says things that you were not aware, I'm going to presume [the State] is referencing to a possible homicide. So you may answer that question if that's what the answer is to, sir.

[Witness]: Yes, sir.

[Court]: You may proceed.

[Counsel for State]: Was he talking to you about a case that wasn't yours?

[Witness]: Yes.

[Counsel for State]: And specifically - -

[Defense Counsel]: Objection, Your Honor.

[Court]: Yes, sir. If you can answer the question, as asked earlier, if he talked to you about a homicide. Strike from the record "a case that was not yours." The jury will be instructed to disregard that statement. You may proceed, Sergeant Pruitt.

[Witness]: [A]fter I advised him of his rights, I was talking to him in the Robbery Office, and he was telling me about a robbery that took place. And it wasn't my case, so I started researching it. I stepped back out, started looking it up. Came back in, started talking to him, because he had told me about someone getting robbed

- 24 -

for an iPhone up on the second level on some steps that was sitting outside. And so after he was telling me about it, I knew it wasn't my case. And he was telling me that the gentlemen got shot.

[Defense Counsel]: Objection.

[Court]: Yes, sir.

[Defense Counsel]: I think you just instructed on that [mentioning that it was not Sergeant Pruitt's case].

[Court]: I will overrule that objection.

Ladies and gentlemen, . . . you've heard the term "case officer" or "case agent" whatever that term is many times. When the Memphis Police Department investigate cases, they assign a lead detective or a case officer to work on the cases, and that officer will delegate responsibility to the other folks that work[] with the Memphis Police Department.

So when Sergeant Pruitt tells me it is not his case, he's simply saying there was a lead investigator who was assigned to handle this case, and he may have been delegated to do so[me] things for that person. So by saying it's not his case, he's simply telling you that he was not the lead investigator on that homicide.

Counsel for the State went on to ask Sergeant Pruitt if he was "dealing with a robbery where someone is shot but doesn't die," if that is handled by his division, the robbery division. Sergeant Pruitt indicated that if it was a robbery where no one died, the robbery division took the case; if it was a robbery where someone died, homicide was in charge of the case. Sergeant Pruitt later testified that Defendant was discussing a robbery that turned into a homicide so Sergeant Pruitt terminated his questioning of Defendant and turned Defendant over to the homicide division.

Defendant characterizes this issue as admission of a prior bad act of Defendant. As set forth above, Rule 404(b) applies only to "bad acts," *Clark*, 452 S.W.3d at 289, and testimony about behavior which is relevant and which does not constitute a crime or bad act is not analyzed under the Rule. *Reid*, 213 S.W.3d at 814. We fail to see how the evidence at issue constitutes evidence of prior bad acts under Rule 404(b). Nowhere in

the testimony of Sergeant Pruitt does it refer to prior bad acts of Defendant or the fact that Defendant was being investigated for an unrelated robbery. Sergeant Pruitt merely testified that he worked in the robbery division, was getting information from Defendant, and realized the information he was receiving was not related to his case. At that point, he investigated the facts as relayed by Defendant, realized that the case was being investigated by the homicide division, and turned the case over to homicide. Therefore, any analysis of the evidence is more appropriate under Tennessee Rule of Evidence 403. Neither party suggests on appeal that the testimony of Sergeant Pruitt was not probative. However, Defendant suggests that the testimony was prejudical, citing *State v. Jeff Carter* to support his argument. 2010 WL 5343212.

In *Jeff Carter*, the defendant was charged with one count of rape of a child, but "the jury heard several mentions that the [d]efendant had sexually abused [the victim], beyond that of the indicted offense." *Id.* at *15. The victim testified that the defendant molested her "[e]very other day" and that on other occasions the defendant had digitally penetrated her and had oral sex with her. *Id.* Additionally, the State produced three witnesses who testified that the Defendant had confessed to them that he had sexually abused the victim. *Id.* at *5-6. This Court noted that "the only [direct] evidence that the [d]efendant sexually abused [the victim] was [the victim's] testimony." *Id.* at *15. The evidence of uncharged sexual acts bolstered the victim's testimony while undermining the defendant's credibility. Furthermore, the risk that a jury would convict a defendant based upon propensity evidence "is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial." *Id.* (quoting *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005)). Because the case hinged upon the victim's credibility, this Court concluded that "more probably than not, hearing [the] propensity evidence affected the jury's assessment of the credibility of the witnesses and allowed the jury 'to conclude more comfortably' that the [d]efendant sexually abused [the victim]." *Id.*

Unlike *Jeff Carter*, in the case herein, there was no direct evidence of uncharged acts by Defendant admitted at trial. Defendant argues that the testimony of Sergeant Pruitt could lead the jury to guess that Defendant was being questioned for another robbery before he was sent to be questioned by homicide. We are aware that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. However, prejudicial evidence is not excluded as a matter of law. *Carruthers*, 35 S.W.3d at 577 (citing *Gentry*, 881 S.W.2d at 6). While the evidence that Defendant was in custody in the robbery division and later transferred to the homicide division for questioning about the case herein was somewhat prejudicial, looking at the excerpt above, it is clear that the trial court carefully limited the testimony to avoid direct references to any unrelated robbery investigation involving Defendant. In other words,

any references to another case or another robbery were quickly diffused by the trial court and removed from the record. Defendant is not entitled to relief on this issue.

## V. *Alleged Discovery Violations/Denial of Motion for Continuance*

Defendant insists that the trial court improperly admitted testimony from Sergeant Pruitt regarding an oral admission made by Defendant that was not produced in discovery. Specifically, Defendant complains that Sergeant Pruitt was permitted to testify, over objection, that Defendant made an oral statement to him about the homicide in this case which ultimately resulted in Defendant being questioned by the homicide department.

During trial, Sergeant Pruitt alluded to a statement Defendant made to him while in the custody of the robbery department. Defense counsel objected, arguing that he did not have the statement in discovery and wanted to take a recess in order to review the statement prior to cross-examination of Sergeant Pruitt. The State acknowledged that the oral statement was not produced in the "report" prepared by Sergeant Pruitt but that it was provided in discovery, had come up several times in prior hearings, and was provided orally to Defendant. The trial court made a finding that the statement was discussed in previous hearings, overruling Defense counsel's objection and request for time to locate the statement.

Now, on appeal, Defendant insists that the trial court's decision to overrule the objection was prejudicial error and, as a result, he is entitled to a new trial. To support his argument, Defendant cites to Rule 16(d)(2) of the Tenessee Rules of Criminal Procedure. This portion of the rule provides as follows:

> *Failure to Comply with a Request [for Discovery].* If a party fails to comply with this rule, the court may:
> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;
> (B) grant a continuance;
> (C) prohibit the party from introducing the undisclosed evidence; or
> (D) enter such other order as it deems just under the circumstances.

There is no proof herein, other than the assertion by defense counsel, that there was a discovery violation. The trial court found that the State complied with discovery by disclosing the oral statement prior to trial. Moreover, counsel for the State commented that she witnessed defense counsel discussing the oral admission with Sergeant Pruitt prior to trial. Defendant cannot establish that the trial court abused its discretion in refusing to grant a continuance where there is no proof of a discovery

- 27 -

violation. *See State v. Collins*, 35 S.W.3d 582, 584 (Tenn. Crim. App. 2000). Defendant is not entitled to relief on this issue.

## VI. Expert Testimony

Defendant argues that the trial court improperly prohibited Dr. Walker from testifying about Defendant's "mental limitations." The State submits that Dr. Walker himself conceded that the test results were unreliable due to Defendant's malingering; therefore, the trial court did not abuse its dicsretion in excluding the evidence.

As discussed in detail above, Dr. Walker testified at the hearing on the motion to suppress. Prior to trial, the State moved to exclude the testimony of Dr. Walker from the trial and objected to any questioning about Defendant's mental limitations based on Dr. Walker's prior testimony that the test results were unreliable. At the close of the State's proof, in a jury-out hearing, the trial court summarized the pretrial testimony of Dr. Walker and determined that the testimony should be excluded from trial. The trial court commented that the testimony from Dr. Walker "would be one hundred percent (100%) wholly speculative. It would not be reliable because [Defendant] continued to malinger, continued to not tell the truth . . . ." The trial court went on to say that "under 701 and 702, there is nothing there that would substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Moreover, the trial court held that "this is not a case in which this speculative testimony should be admissible when [Defendant] did everything that he could in order to malinger and frustrate Dr. Walker's attempts to interview him and grossly lied and continued to lie to Dr. Walker." In conclusion, the trial court held it would be inconsisent with the Tennessee Rules of Evidence and Criminal Procedure to "allow a witness to testify about speculative testimony that, in his own words, would not be reliable." In other words, the trial court excluded the testimony on the basis that it was not relevant, speculative, unreliable, and would not assist the jury.

Ordinarily, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Further, Tennessee Rule of Evidence 702 requires that expert testimony "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 703 requires that the facts or data underlying the expert's opinion be trustworthy. A trial

court's application of these rules to exclude expert testimony will not be reversed on appeal absent an abuse of discretion. *State v. Edison,* 9 S.W.3d 75, 77 (Tenn. 1999).

In *State v. Ackerman*, 397 S.W.3d 617, 633 (Tenn. Crim. App. 2012), this Court addressed a similar question regarding the exclusion of expert testimony about false confessions. On appeal, this Court articulated the standard for determining whether the decision to exclude certain evidence violated a defendant's constitutional right to present a defense:

> Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, *see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:
>
> > (1) Whether the excluded evidence is critical to the defense;
> >
> > (2) Whether the evidence bears sufficient indicia of reliability; and
> >
> > (3) Whether the interest supporting exclusion of the evidence is substantially important.
>
> *Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

*State v. Ackerman*, 397 S.W.3d 617, 633 (Tenn. Crim. App. 2012).

In *Ackerman*, the defendant sought to introduce the testimony of Dr. Bruce Frumkin, who intended to "provide the jury with psychological information about the defendant that would explain why he was more likely to provide false or inaccurate

information" during a police interrogation. *Id.* at 631. Specifically, the doctor would testify about tests he performed, for example, an IQ test, "a personality inventory test, a personality factor test, and 'the Gudjohnsson.'" *Id.* at 631. However, Dr. Frumkin "reiterated that he would not offer an opinion on whether the defendant's admissions were false," and he only would testify that "the defendant possessed psychological traits that made him more vulnerable to suggestion." *Id.* The trial court in *Ackerman* excluded this testimony, reasoning that the testimony "would not substantially assist the trier of fact" and that it would "lead to confusion and misunderstanding." *Id.* That decision was affirmed on appeal by this Court, on the basis that the testimony was "marginally relevant at best" and that "a real possibility existed that Doctor Frumkin's testimony would lead to a confusion of the issues." This Court found that the exclusion of the expert's testimony did not deprive the Defendant of his constitutional right to present a defense because the testimony was of little probative value and did not rebut the prosecution's case.

Applying the above analysis to the case herein, we note that Dr. Walker conceded that Defendant's interview was "grossly untruthful." In fact, Dr. Walker did not find any evidence that Defendant was unable to intelligently and/or voluntarily waive his rights. Instead, Dr. Walker determined that Defendant understood the rights and waived them. Thus, the trial court's findings that the testimony by Dr. Walker would be irrelevant, speculative, unreliable, and would not assist the jury are supported by the record. The trial court did not abuse its discretion. Accordingly, Defendant's right to present a defense was not violated, and he is entitled to no relief on this basis.

*VII. Right to Confrontation*

Defendant challenges the trial court's decision to limit the cross-examination of witness Tyran Phillips by precluding the Defendant from questioning Mr. Phillips about unrelated pending criminal charges and argues that the trial court inapprorately commented on the testimony. Mr. Phillips testified that he received the alleged murder weapon after "Pretty Boy" delivered it to him from Ms. Smith's apartment and that the weapon was later stolen from his apartment and found in a sewer drain. The State disagrees with Defendant's complaint on appeal, stating that the trial court properly determined Defendant could not impeach the witness with evidence of a charge for which the witness had not been convicted and that the trial court did not comment on the evidence or bolster the witness's credibility.

The Confrontation Clause provides a criminal defendant the rights to confront and cross-examine witnesses. *See* U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). A component part of this constitutional protection is the right to establish bias or to otherwise impeach the credibility of a witness. *Rice*, 184 S.W.3d at 670; *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001); *State v. Howell*, 868 S.W.2d 238, 252 (Tenn. 1993). The propriety, scope,

manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court. *Reid*, 213 S.W.3d at 839; *Rice*, 184 S.W.3d at 670. When the defendant's right to cross-examine witnesses is unreasonably restricted, the trial court abuses its discretion. *Reid*, 213 S.W.3d at 839; *Rice*, 184 S.W.3d at 670; *Davis v. State*, 212 S.W.2d 374, 375 (Tenn. 1948).

When a defendant is denied the right to conduct an effective cross-examination, it is a constitutional error. *Rice*, 184 S.W.3d at 670; *Sayles*, 49 S.W.3d at 280. Thus, the conviction will stand only if the violation is deemed harmless beyond a reasonable doubt. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (discussing the harmlessness standard for constitutional errors). Whether an error is harmless depends upon various factors, including "'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Rice*, 184 S.W.3d at 670-71 (quoting *Deleware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

With these principles in mind, we turn to the specific complaints made by Defendant regarding limitations on his cross-examination of Mr. Phillips. During the direct examination of Mr. Phillips, the State asked if Mr. Phillips was a voluntary witness. Mr. Phillips stated that he was "locked up" and placed under subpoena in order to secure his testimony because testifying in court "ain't [his] type of thing." Mr. Phillips testified that there were no promises or threats to secure his appearance and that everything he said was the truth.

On cross-examination, defense counsel asked Mr. Phillips if he had to be "arrested and brought into custody" in order to talk to the police. Mr. Phillips replied that he "was brought into custody on an unrelated charge." Counsel for the State objected. The trial court instructed the jury to disregard any reference to an unrelated charge. Defense counsel sought to question the witness on whether he had a pending charge, and the trial court denied that request because "a charge [does not] go[] to credibility . . . . An arrest is not an indication of a conviction, it is not an indication of truthfulness, an arrest means nothing . . . . You cannot ask a witness whether or not they've been arrested and say that goes to his credibility." Defense counsel argued that Tennessee Rule of Evidence 609 and 616 allow him to question the witness about a pending charge. The trial court disagreed, sustaining the State's objection.

Tennessee Rule of Evidence 609(a) provides that a witness's credibility may be attacked through cross-examination regarding a conviction of a crime punishable by death or imprisonment in excess of one year or a crime involving dishonesty or false statement. Additionally, Tennessee Rule of Evidence 616 provides that a "party may

offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." The right of a defendant to impeach a witness for bias "includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). An undue restriction on this right may violate a defendant's constitutional right to confrontation. *Id.*

A potential for bias exists when "a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial" due to the possibility that the prosecutor's office would "take favorable testimony into account when subsequently prosecuting the witness's pending charge." *State v. Eric James Taylor*, No. E2002-00966-CCA-R3-CD, 2003 WL 21542464, at *5 (Tenn. Crim. App. July 9, 2003), *perm. app. denied* (Tenn. Oct. 6, 2003). However, a charge pending in a different jurisdiction has "much less relevance as a source of potential bias than if it were pending in the same district as the [d]efendant's charges." *Id.*

We determine that the trial court improperly prohibited Defendant from inquiring about the pending charge on cross-examination but determine that any error is harmless beyond a reasonable doubt. *See Sayles*, 49 S.W.3d at 280. In making this determination, our supreme court instructs us that:

> [t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* (quoting *Van Arsdall*, 475 U.S. at 684). Mr. Phillips's testimony about how he came to be in possession of the gun was not the only testimony or proof connecting Defendant to the weapon. It was cumulative. Ms. Turley had already testified that Defendant brought the gun to her apartment with Mr. Brown and later brought the gun back to her apartment when he was injured. Ms. Smith confirmed that she got the gun from Ms. Turley before giving it to Mr. Phillips. The testimony provided by Mr. Phillips merely completed the chain of custody of the gun up to the point where it was allegedly stolen from his apartment and placed in the drainage ditch. His testimony was not crucial to the

State's case.  Accordingly, the error in limiting the cross-examination of Mr. Phillips was harmless.

In a related issue, Defendant argues that the trial court additionally violated his right to confrontation by improperly commenting on Mr. Phillips's testimony. Specifically, Defendant complained that the trial court "improperly bolstered Mr. Phillips' testimony and thereby limited Defendant's cross examination of him by interjecting the trial court's conclusions of the testimony during impeachment of the witness."  At trial, as discussed above, Mr. Phillips testified that he stored a gun at his home but that he "never touched the gun."  Defense counsel then started to impeach Mr. Phillips with a prior inconsistent statement.  The following exchange occurred:

| | |
|---|---|
| [Defense Counsel]: | Okay.  All right.  Now, did you just testify that you - - I want to make sure I heard you correctly - - you never touched the gun? |
| [Witness]: | What you talking about?  As far as while it was at my house? |
| [Defense Counsel]: | Yes. |
| [Witness]: | No.  It was under a pillow in a couch in my room.  I never touched it, no. |
| [Defense Counsel]: | Pretty Boy put it in there? |
| [Witness]: | Yeah. |
| [Defense Counsel]: | You saw where he put it, but you never touched it? |
| [Witness]: | No, I never touched it. |
| [Defense Counsel]: | Okay.  Do you recall being asked, "Do you know if the weapon is loaded?"  Do you remember the police asking you that? |
| [Witness]: | Yeah. |
| [Defense Counsel]: | And you told them you don't know, right? |
| [Witness]: | I don't.  I didn't. |

- 33 -

[Defense Counsel]: I'm sorry.

[Witness]: I didn't. I never - -

[Defense Counsel]: You didn't?

[Witness]: I never checked it to see was it loaded.

[Defense Counsel]: Right.

[Witness]: So I didn't.

[Defense Counsel]: Correct. And you told them, "I haven't fumbled with it since I moved it on Saturday"?

[Witness]: [S]ince it was moved to my house on Saturday or since I moved it Saturday?

[Defense Counsel]: No, sir. Yeah. "I haven't fumbled with it since I moved it on Saturday"?

[Witness]: No, I don't recall saying that.

[Defense Counsel]: You don't? Your Honor, may I pass this to the witness?

[Court]: Yes, sir. First, Mr. Phillips, do you recognize that?

[Witness]: What?

[Court]: The statement that was just given to you by Deputy Smith.

[Witness]: Do I recognize it?

[Court]: Yes, sir.

[Witness]: Yeah.

[Court]: I'm sorry?

[Witness]: Yes, sir.

[Court]:                You do recognize it?  And what [defense counsel] is asking is whether or not you had given a statement to the police.  He wants you to review that for a second. Take a look at it, see if you recognize it, see if it's the statement that you had given to the police.

[Witness]:              (The witness reviews the document).  Yes.

[Court]:                He's indicating "yes," for the record.    [Defense counsel,] you may proceed.

                . . . .

[Defense Counsel]:  And - - but it's also written, "I haven't fumbled with it since I moved it on Saturday."

[Witness]:              I see it say that, but I never fumbled with that gun.  It was moved to my house on a Saturday.

[Defense Counsel]:  You say you said that, but you really never fumbled with it?

[Witness]:              I never fumbled with the gun or . . . my fingerprints would have been on it.

[Defense counsel]:  Right.  Well, . . . why did you tell them that if you . . . hadn't moved it, if you hadn't fumbled with it?

[Witness]:              I didn't fumble with it.

[Defense counsel]:  Why did you say that?

[Witness]:              It was moved to my house on a Saturday.

[Defense counsel]:  But you said, "I haven't fumbled with it."

[Witness]:              I see what it say I said.

[Court]:                [Defense counsel], what he said the first time that you said you didn't hear that, "I see what it says, but I never told the police I fumbled with it."

- 35 -

| [Witness]: | I never - - I never told the police I fumbled with the gun 'cause I didn't. |
|---|---|
| [Defense counsel]: | Okay.  So you never said that? |
| [Witness]: | No. |
| [Defense counsel]: | Okay.  Your Honor, can I get that back? |

Initially, we note that Defendant did not make a contemporaneous objection to the trial court's statement.  Ordinarily, in the absence of an objection, this issue would be waived.  Tenn. R. App. P. 36(a).  Of course, "error involving a substantial right" that "more probably than not affected the judgment or would result in prejudice to the judicial process" may be considered at "any time."  Tenn. R. App. P. 36(b).  Judges in Tennessee are prohibited by the state constitution from commenting upon the credibility of witnesses or upon the evidence in the case.  Tenn. Const. art. VI, § 9.  Thus, a fundamental right of Defendant to a fair trial is implicated if a trial judge improperly comments on the credibility of a witness.  "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury."  *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989).  However, "not every comment on the evidence made by a judge is grounds for a new trial."  *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004).

In the case herein, it is apparent from the exchange above that there was considerable confusion surrounding the witness's understanding of both the questions being asked by defense counsel and defense counsel's understanding of the witness's answers to the questions.  In our view, the trial court's comment merely tried to clarify the witness's response.  The clarification accurately represented the testimony of the witness, as the witness had acknowledged what his statement to police contained but disputed that he told police he touched the gun.  We fail to see how the trial court's comments could be viewed as prejudicial.  Defendant is not entitled to relief on this issue.

### VIII.  *Prosecutorial Misconduct*

Defendant complains that the State committed prosecutorial misconduct during closing argument.  Specifically, he points to the State's comment about streets "littered with dead bodies" presented alongside slides showing contrasting pictures of the victim both alive and dead as both sensational and inflammatory.  The State argues that Defendant "has taken the prosecution's comment regarding bodies in the street out of context" because that expression was used in the State's explanation of the burden of

proof. Additionally, the State notes that the photographs used during closing argument were already properly in evidence. Finally, the State insists that Defendant waived the issue. We agree. Defendant did not object to this statement at trial and failed to cite to the record on appeal. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Therefore, this issue is waived.

## IX. *Sleeping Juror*

Defendant next argues that the trial court improperly denied the motion for new trial because at least one of the jurors slept during a portion of the trial. To support his argument, Defendant testified at the hearing on the motion to recuse that he saw jurors sleeping because at least one juror did not move his head when the State displayed a photograph. Defendant also testified that security officers saw sleeping jurors. The State counters that Defendant did not seek a mistrial and did not present the testimony of the security officers at the hearing on the motion for new trial.

Defendant correctly notes that a sleeping juror may warrant a new trial when an objection is promptly raised and prejudice is established. *State v. Chestnut*, 643 S.W.2d 343, 346 (Tenn. Crim. App. 1982). However, a defendant must make more than a mere showing that a juror slept during a portion of the evidence in order to justify a new trial. *Id.* "Whether a juror was asleep or otherwise inattentive at some time during the trial is a question" within the trial judge's discretion. *Gary Bernard Sanders v. State*, No. 02-C-01-9206-CR-00137, 1994 WL 111080, at \*4 (Tenn. Crim. App. Mar. 30, 1994), *perm. app. denied* (Tenn. Oct. 3, 1994). In determining whether to grant a new trial, the trial court may consider the length of time the juror slept and the importance of the evidence presented. *Id.* Of course, a trial court may choose to dismiss jurors who are "unable or disqualified to perform their duties." Tenn. R. Crim. P. 24(f). A trial court's decision to dismiss a juror and to select an alternate juror is reviewed under an abuse of discretion standard. *State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991).

At trial, Defendant brought this to the attention of the trial court, and the court assured Defendant that it would monitor the jury and that the trial court had not "seen any of these folks sleeping." In our view, Defendant failed to show prejudice due to a juror sleeping. Thus, the trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

## X. *Sufficiency of the Evidence*

Defendant complains that the evidence of corroboration was insufficient to convict Defendant of felony murder and especially aggravated robbery. Specifically, Defendant argues that there was inadequate evidence of his guilt independent from the statement he gave police. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Under Tennessee law, "a person cannot be convicted solely on the basis of an uncorroborated extrajudicial confession." *State v. Bishop*, 431 S.W.3d 22, 61 (Tenn. 2014); *see also State v. Clark*, 452 S.W.3d 268, 279 (Tenn. 2014). Whether a confession is corroborated is a mixed question of law and fact that we review de novo. *Id.* If a challenge to corroboration of a confession rests on disputed facts, this Court should presume that the trial court's resolution of factual disputes is correct, unless the evidence preponderates against those findings. *Id.* at 62. Our supreme court has explained that to determine whether the confession has been sufficiently corroborated, appellate courts are to apply the following "'modified trustworthiness' corroboration test":

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence

tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

*Bishop*, 431 S.W.3d at 58-59 (footnotes omitted). Our supreme court further explained that "[o]ne way the State can effectively bolster the defendant's admission or confession is to present independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before or after the crime." *Id.* at 60.

In this case, we determined above that Defendant made his statement voluntarily and knowingly and was not forced or coerced into making the statement. In the statement, he admitted that he was present and participated in a robbery during which the victim was shot. At the time he gave the statement, he had not been given any information about the incident by the police. The victim's mother confirmed that he was sitting outside after work when she heard people talking, shots fired, and then her son coming into the apartment saying that he had been shot. The victim's neighbor also confirmed Defendant's description of the events. The victim died as a result of his injuries. Additionally, Ms. Turley testified that Defendant brought a gun into her home on two separate occasions. He hid the gun under the couch on the second occasion. She gave the gun to Ms. Smith. Eventually, the gun ended up in the possession of Mr. Phillips and then, the police. The proof presented by the State provided "substantial independent evidence" that Defendant had "specific personal knowledge about the crime." *Id.* at 60 (citing *State v. Mauchley*, 67 P.3d 477, 489 (Utah 2003)). The State provided evidence that corroborated Defendant's confession. Defendant is not entitled to relief on this issue.

## XI. Jury Instruction Regarding Corroboration

In a related issue, Defendant complains that the trial court failed to properly charge the jury with an instruction on corroboration.

"[A] defendant has a right to a correct and complete charge of the law," *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001), and the trial court has the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). Tennessee law, however, does not mandate that any particular jury instructions be given, so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). Erroneous jury instructions require a reversal, unless the error is harmless beyond a reasonable doubt. *See Welch v. State*, 836 S.W.2d

586, 589 (Tenn. Crim. App. 1992). Whether the trial court properly instructed the jury on a certain offense is mixed question of law and fact. *State v. Thorpe*, 463 S.W.3d 851, 859 (Tenn. 2015); *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001). Accordingly, the standard of review is de novo with no presumption of correctness. Defendant did not submit a written request for a jury instruction on corroboration. Rule 30 of the Tennessee Rules of Criminal Procedure provides that requests for a special jury instruction be in writing. *State v. Vickers*, 985 S.W.2d 1, 8 (Tenn. Crim. App. 1997); *State v. Brewer*, 932 S.W.2d 1, 15 (Tenn. Crim. App. 1996). Absent plain error, Defendant is not entitled to relief. Tenn. R. App. P. 36. Defendant has pointed to no unequivocal rule of law that has been breached; there is no plain error.

## XII. Cumulative Error

Lastly, Defendant suggests that cumulative errors at trial require a reversal of his convctions. The errors committed in Defendant's trial do not lend themselves to being compounded to show that he received an unfair trial. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). Consequently, there can be no cumulative error.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE